SHERIDAN v FOREST HILLS PUBLIC SCHOOLS

Docket No. 215572. Submitted February 10, 2000, at Grand Rapids. Decided September 25, 2001, at 9:25 A.M. Leave to appeal sought.

Vicki S. Sheridan brought an action in the Kent Circuit Court against Forest Hills Public Schools, alleging that the defendant, her employer, is liable to her under the Civil Rights Act, MCL 37.2101 *et seq.*, for sexual harassment in the form of a hostile work environment created by a co-worker. The court, Robert A. Benson, J., granted summary disposition for the defendant, ruling that the defendant lacked actual or constructive notice on which the defendant could have taken prompt remedial action. The plaintiff appealed.

The Court of Appeals *held*:

1. An employee who seeks to hold the employer responsible under the Civil Rights Act for a hostile work environment created by a supervisor or co-worker must show that the employer knew or should have known of the harassment in question and failed to take remedial action. The employee can demonstrate that the employer knew of the harassment by showing that the employee complained to higher management of the harassment or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge.

2. "Higher management" means those in the employer's chain of command who possess the ability to exercise significant influence in the decision-making process of hiring, firing, and administering discipline over the alleged harasser.

3. The defendant lacked actual notice of the alleged harassment inasmuch as the plaintiff did not complain of the harassment to anyone in higher management.

4. The defendant lacked constructive notice of the alleged harassment because the harassment was not substantially pervasive enough that constructive knowledge by the defendant can be inferred. Although the defendant knew that the alleged harasser had harassed two other women at work, constructive knowledge by the defendant of the plaintiff's harassment cannot be inferred inasmuch as the plaintiff complained only that the alleged harasser

"bothered" her and she did not disclose to the defendant the sexual nature of the harassment she allegedly endured.

5. The plaintiff's claim that the defendant had a duty to inform her of the alleged harasser's sexual harassment of other workers is rejected absent any citation of supporting authority.

Affirmed.

WHITE, J., dissenting, stated that the grant of summary disposition for the defendant should be reversed because a genuine issue of material fact exists concerning whether the defendant had notice of the alleged hostile work environment. Notice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring. In this case, the trier of fact could properly conclude that a reasonable employer would have been aware from the complaints made by the plaintiff to her superiors and from the history of the alleged harasser that there was a substantial probability that the plaintiff was being sexually harassed.

CIVIL RIGHTS — SEXUAL HARASSMENT — HOSTILE WORK ENVIRONMENT —
EMPLOYER LIABILITY.

An employee who seeks to hold the employer responsible under the Civil Rights Act for a hostile work environment created by a supervisor or co-worker must show that the employer knew or should have known of the harassment in question and failed to take remedial action; the employee can demonstrate that the employer knew of the harassment by showing that the employee complained to higher management of the harassment or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge; "higher management" refers to those who possess the ability to exercise significant influence in the decision-making process of hiring, firing, and administering discipline over the alleged harasser (MCL 37.2101 *et seq.*).

*Elizabeth S. Holmes*, for the plaintiff.

*Miller, Johnson, Snell & Cummiskey, P.L.C.* (by *Jon G. March* and *Susan B. Hoekema*), for the defendant.

Before: ZAHRA, P.J., and WHITE and HOEKSTRA, JJ.

ZAHRA, P.J. Plaintiff Vicki S. Sheridan appeals as of right the circuit court's order granting defendant

Forest Hills Public Schools[1] summary disposition under MCR 2.116(C)(10) in this hostile work environment sexual harassment case brought under the Civil Rights Act (CRA), MCL 37.2101 *et seq.* We affirm.

FACTS

This case arises out of the alleged sexual harassment of plaintiff by Vern Knapp. Both plaintiff and Knapp were custodians employed by defendant when the alleged sexual harassment occurred. The genuine and material facts viewed in a light most favorable to plaintiff establish the following.[2] On August 26, 1993, plaintiff informed defendant's assistant superintendent of personnel that she was sexually harassed on the job. In a follow-up meeting on August 31, 1993, plaintiff complained that, in the course of her employment on August 23, 1993, Knapp propositioned her and physically exposed himself to her. Defendant immediately began an investigation that culminated in the termination of Knapp's employment on October 4, 1993.

After reporting the incident, plaintiff took a leave of absence and was subsequently placed on a medical leave. Plaintiff never returned to work. On February 28, 1996, plaintiff brought this suit, specifically alleging that Knapp raped her in defendant's Community and Aquatic Center (the "pool building") in the spring

---

[1] We refer to defendant-appellee Forest Hills Public Schools as "defendant." The trial court entered a stipulated order of dismissal with respect to Citizens Insurance Company and ordered a default judgment against Vern Knapp. Neither Citizens nor Knapp is a party to this appeal.

[2] Any facts set forth in footnote one of the dissenting opinion that are inconsistent with or in addition to the factual recitation set forth in the majority opinion are either immaterial to this dispute or unsupported by the uncontroverted evidence presented in support of defendant's motion.

of 1991.[3] Plaintiff also alleged that Knapp repeatedly harassed and abused her with "sexual demands, unconsented touchings and propositions to engage in sexual activities." Plaintiff maintained that defendant was liable pursuant to the CRA for Knapp's actions under a theory of respondeat superior.[4]

Defendant brought a motion for summary disposition, arguing, in relevant part, that plaintiff never reported any acts of assault or sexual harassment to defendant before August 1993. Defendant maintained that there was no evidence that it failed to take prompt remedial action against Knapp. In the absence of such evidence, defendant argued, it could not be held liable for the actions of Knapp. The trial court granted defendant's motion for summary disposition. This appeal followed.

A. THE MANAGEMENT STRUCTURE OF
FOREST HILLS PUBLIC SCHOOLS

Defendant is a suburban Grand Rapids school district that is operated under the supervision of a superintendent. Employee matters are administered through the assistant superintendent for personnel. Both plaintiff and Knapp were custodians for defendant. Custodians are supervised by the director of

---

[3] Plaintiff's complaint and brief on appeal alleged that the rape occurred in April 1991. However, plaintiff testified in deposition that the rape occurred in April 1990.

[4] Plaintiff filed her complaint against Forest Hills Public Schools, Donald J. Finch, Linda Schmitt VanderJagt, and Vern Knapp, jointly and severally, and Citizens Insurance Company of America, alleging one count of hostile work environment sexual harassment, one count of gross negligence, three counts of intentional infliction of emotional distress, and one count of bad faith on the part of Citizens Insurance Company. Soon after the complaint was filed, Finch and VanderJagt were voluntarily dismissed from the suit.

buildings and grounds who reports to the director of operations. The director of operations reports directly to the assistant superintendent for personnel. Custodial crews are divided by facility. At each facility, one custodian is designated the "head custodian." The head custodian is responsible for noting attendance and insuring that custodial work is properly completed. When a custodial crew consists of more than one custodian per shift, one member of the shift is designated a "lead custodian," who assumes the duties of the head custodian for that shift. All custodians are members of a collective bargaining unit. The director of buildings and grounds and all persons above him are not members of the collective bargaining unit. The lead and head custodians do not have authority to hire, fire, or discipline employees or to render recommendations regarding pay, hours, or job transfers. Such decisions are made by the superintendent on the basis of recommendations from the director of buildings and grounds, the director of operations, and the assistant superintendent for personnel.

### B. CLAIMS OF HARASSMENT BEFORE AUGUST 1993

#### 1. KNAPP'S HARASSMENT OF PLAINTIFF

Plaintiff testified that in April 1990 Knapp entered the pool building and raped her. Plaintiff admitted that she did not report the rape to anyone. Plaintiff also testified that after the rape, Knapp harassed her by calling her pager repeatedly and by loitering outside the pool building while plaintiff worked. Plaintiff informed Donald Finch, the director of buildings and grounds, and Kathy Knapp, the head custodian at the pool building, that she did not feel safe

working nights.[5] Plaintiff asked that security be pro-
vided during her shift. However, plaintiff did not com-
plain to anyone that Knapp was harassing her. Plain-
tiff also testified that in 1991 Knapp entered the pool
building and assaulted her in the boiler room by kiss-
ing her on the lips and touching her inappropriately.
Again, plaintiff admitted that she did not report this
incident to anyone.

Later in 1991, plaintiff met with Finch and Terri
Handlin, director of the community education pro-
gram and pool building administrator, to discuss job-
related problems, including plaintiff's security con-
cerns and plaintiff's conduct of bringing her children
to work.[6] Handlin's handwritten notes from the meet-
ing indicate that plaintiff believed Knapp was calling
her pager and loitering outside the pool building
while plaintiff worked. The notes also indicate, how-
ever, that plaintiff did not want Finch or Handlin to
assist plaintiff in dealing with Knapp. Plaintiff's recol-
lection of the meeting is consistent with Handlin's
notes. Plaintiff testified that Handlin and Finch
offered to assist her if Knapp was causing her prob-

---

[5] We disagree with the dissent's statement, "[plaintiff] did not report the
rape to defendant because Knapp's wife was her supervisor . . . ." Kathy
Knapp, who at the time was the spouse of Vern Knapp, was a head custo-
dian at the pool building. Plaintiff testified that she left notes on Kathy
Knapp's desk requesting security at the building during her shifts. While
plaintiff indicated the situation was "awkward," nothing in the record
presented to this Court indicates that plaintiff believed Kathy Knapp was
her supervisor. In fact, when specifically asked to name her supervisors at
the pool building, plaintiff named Finch and Paul Northuis. Thus, there
exists no factual basis on which one may reasonably conclude that plain-
tiff did not report the alleged rape *because* Kathy Knapp was her
supervisor.

[6] Defendant's witnesses claimed that the meeting occurred in August
1991. Plaintiff claims that the meeting occurred in May 1991. The specific
date of this meeting is not material to the issues before this Court.

lems. However, plaintiff declined their help, indicating that she "will take care of it [and] handle it" herself. Plaintiff admitted that she did not tell Finch or Handlin about the rape, and she did not provide them with any specifics about the assault in the boiler room. Handlin discussed the matter with a number of people, including Linda VanderJagt, the assistant superintendent for personnel.

Plaintiff also met with VanderJagt, Paul Northuis, the director of operations, and a union representative sometime in the summer of 1991 to discuss her work situation. VanderJagt testified that she asked plaintiff to attend the meeting to discuss plaintiff's claims that Knapp was making noises outside the pool building and calling plaintiff's pager.[7] VanderJagt asked plaintiff if Knapp was bothering her. Plaintiff responded that it was none of their business. Plaintiff claimed that she and Knapp were friends. Plaintiff indicated that she did not want the school involved in her personal life. VanderJagt focused on Knapp because it was brought to her attention that plaintiff had mentioned his name as being the person calling her pager and loitering outside the pool building while she worked. Additionally, VanderJagt was aware that Knapp was previously disciplined because of a 1988 complaint of sexual harassment by another employee.

After VanderJagt met with plaintiff, she met with Knapp. Because plaintiff did not make any complaint against Knapp, VanderJagt merely informed Knapp that there had been rumors that Knapp had made "inappropriate statements or gestures." VanderJagt

---

[7] Plaintiff testified that she cannot recall whether Knapp's conduct was discussed in this meeting. Thus, VanderJagt's recollection of the matters discussed in this meeting is uncontroverted by plaintiff.

reminded Knapp that, pursuant to the 1988 discipline, any further acts of harassment would result in the termination of his employment. VanderJagt did not discipline Knapp at that time.

In September 1991, plaintiff was assigned to work at Northern High School (Northern). Shortly thereafter, Knapp applied for and received a custodial position at Northern. Plaintiff testified that after Knapp received the position she told Mark Scoby, the head custodian at Northern, that "[Knapp] better not come on my side of the building." Scoby specifically inquired about what had happened at the pool building. Plaintiff informed Scoby that the pool incident "was bad." However, plaintiff admitted that she did not provide Scoby with specifics and did not tell Scoby that she had been raped or sexually assaulted.[8] Plaintiff testified that Scoby told her not to worry and that if anything happened at Northern, "we'll take care of it."

---

[8] We disagree with the dissent's statement that plaintiff testified that Scoby and Pete Cleven, the lead custodian on her shift at Northern, were aware of the details of Knapp's prior harassment. While plaintiff testified that Scoby and Cleven seemed to be generally aware that something occurred between plaintiff and Knapp at the pool building, plaintiff did not testify that she informed them of the details of the alleged incidents of harassment. Plaintiff admitted that she did not provide Scoby with specifics or tell him that she had been raped or sexually assaulted. Plaintiff testified that she was "pretty sure" she told Cleven that she had been raped. Plaintiff claimed that she asked Cleven not to tell anyone about it. Cleven denies that plaintiff ever told him she was raped by Knapp. Cleven testified that on August 23, 1993, plaintiff informed him that earlier that day Knapp had propositioned her and exposed himself to her. Cleven claims that, in the course of that conversation, plaintiff told him for the first time that she previously had a consensual sexual encounter with Knapp and asked Cleven not to tell anyone about that encounter. Viewing the facts in a light most favorable to plaintiff, we conclude that plaintiff informed Cleven of the assault, but denied him the authority to report the assault to others.

Plaintiff claimed that in the summer of 1993 Knapp tried to communicate with her and "rubbed up" against her when she and Knapp were assigned to work together at Northern. Plaintiff complained to Scoby about Knapp making physical contact with her. Scoby confronted Knapp and told plaintiff that she could work in a different area. Neither Scoby nor plaintiff informed their immediate supervisor, Finch, or anyone else about the incident of physical contact.

## 2. PRIOR COMPLAINTS AGAINST KNAPP

In 1988, a female employee claimed that she was sexually harassed by Knapp in the course of her employment. Defendant immediately investigated the complaint and found it to be meritorious. Knapp was disciplined. The discipline included a five-day suspension without pay. Additionally, Knapp was ordered to stay away from the employee who was the victim of his harassment, reassigned, and placed on probation. Shortly after Knapp was suspended in 1988, another female employee informed Finch that she had "problems" with Knapp three years earlier.[9] No specifics were provided to Finch and no formal complaint was made.[10]

---

[9] The dissent's discussion regarding alleged circumstances surrounding that employee's report of the 1985 conduct to Finch is immaterial to the issue in this case. Knapp was investigated and disciplined in 1988. He was informed that any future sexual harassment would result in his termination. The fact that Knapp's employment was not terminated for conduct that was claimed to have occurred in 1985 was consistent with the progressive discipline imposed on Knapp. There was no evidence that Knapp engaged in any sexual harassment after the 1988 discipline until 1993, at which time Knapp was promptly investigated and his employment was terminated.

[10] After plaintiff asserted her complaint against Knapp in August 1993, the employee involved in the 1985 incident was interviewed and for the

ANALYSIS

We review de novo a motion for summary disposition based on MCR 2.116(C)(10). Motions brought under this court rule test the factual support of a claim. *Quinto v Cross & Peters Co*, 451 Mich 358, 362-363; 547 NW2d 314 (1996). The moving party has the initial burden of supporting its position with documentary evidence such as affidavits, depositions, admissions, or interrogatory responses. *Smith v Globe Life Ins Co*, 460 Mich 446, 454-455; 597 NW2d 28 (1999). The burden then shifts to the opposing party to establish the existence of a factual dispute. *Id.* at 455. If the party opposing the motion fails to present documentary evidence establishing the existence of a genuine and material fact, the motion should be granted. *Id.*; *Aetna Casualty & Surety Co v Ralph Wilson Plastics Co*, 202 Mich App 540, 548; 509 NW2d 520 (1993).

Under the CRA, a prima facie case of hostile work environment sexual harassment includes the following five elements:

"(1) the employee belonged to a protected group;

(2) the employee was subjected to communication or conduct on the basis of sex;

(3) the employee was subjected to unwelcome sexual conduct or communication;

(4) the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and

---

first time disclosed specific facts regarding the 1985 incident. Defendant determined that this complaint was also meritorious.

(5) respondeat superior." [*Chambers v Trettco, Inc*, 463 Mich 297, 311; 614 NW2d 910 (2000), quoting *Radtke v Everett*, 442 Mich 368, 382-383; 501 NW2d 155 (1993).]

The last element is at issue here. As a general rule, "an employer may avoid liability 'if it adequately investigated and took prompt and appropriate action upon notice of the alleged hostile work environment.'" *Radtke, id.* at 396, quoting *Downer v Detroit Receiving Hosp*, 191 Mich App 232, 234; 477 NW2d 146 (1991). Thus, an employer must have actual or constructive notice of the alleged harassment before liability will attach to the employer. *Radtke, supra* at 397, n 44, citing *Downer, supra* at 235; *Grow v W A Thomas Co*, 236 Mich App 696, 702-703; 601 NW2d 426 (1999), citing *Downer, supra*; *Kauffman v Allied Signal, Inc*, 970 F2d 178, 183 (CA 6, 1992). In *McCarthy v State Farm Ins Co*, 170 Mich App 451; 428 NW2d 692 (1988), this Court explained what was meant by actual or constructive knowledge.

> "Where . . . the plaintiff seeks to hold the employer responsible for the hostile environment created by the plaintiff's supervisor or co-worker, she must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action. . . . The employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment . . . or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." [*Id.* at 457, quoting *Henson v Dundee*, 682 F2d 897, 905 (CA 11, 1982).]

See *Hartleip v McNeilab, Inc*, 83 F3d 767, 776-777 (CA 6, 1996). Courts must apply an objective standard of review when considering whether the employer was provided adequate notice. *Chambers, supra* at

319. "[N]otice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a *substantial probability* that sexual harassment was occurring." *Id.* (emphasis added).

### A. DEFENDANT DID NOT HAVE ACTUAL NOTICE OF A HOSTILE WORKPLACE

Applying these legal principles to this case, we conclude that defendant did not have actual knowledge of the sexual harassment before August 1993 because plaintiff did not complain about the harassment to higher management. The term "higher management" is not defined in *McCarthy*[11] or any subsequent case involving a claim under the CRA. We define this term to mean someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee. This definition is consistent with our Supreme Court's analysis of harassment alleged by "supervisors." See *Chambers, supra* at 318-319; *Champion v Nation Wide Security, Inc,* 450 Mich 702, 705; 545 NW2d 596 (1996); *Radtke, supra* at 396-397.[12]

---

[11] As noted earlier, *McCarthy* generally stated " '[t]he employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management....' " *McCarthy, supra* at 457, quoting *Henson, supra* at 905.

[12] To the extent that the dissent relies on federal cases involving sexual harassment claims under title VII, that reliance is misplaced. In *Chambers,* our Supreme Court held that federal principles of vicarious liability related to sexual harassment claims brought under the federal title VII do not apply to claims brought under Michigan's CRA. The Court reasoned that federal principles are contrary to Michigan case law and the express language of the CRA. *Chambers, supra* at 303, 316. The Court noted that

By defining "higher management" as we have, we are identifying management employees who have actual authority to effectuate change in the workplace. These are the type of employees implicitly referred to as "higher management" in *McCarthy*. Moreover, the purpose of defining the term "higher management" is to identify the employees whose knowledge may fairly be imputed to the employer. In *Chambers*, our Supreme Court observed that the term "employer" is statutorily defined under the CRA to include the employer and its agents. *Chambers, supra* at 311. Because these "higher management" employees are vested by the employer with actual authority to effectuate change in the workplace, principles of agency law support the conclusion that the knowledge they possess regarding conditions in the workplace would properly be imputed to the employer.

We reject plaintiff's contention that defendant possessed actual knowledge of a hostile workplace because plaintiff informed the head custodian at

---

the CRA is significantly distinguishable from title VII insofar as the CRA specifically defines "employer" to include both the employer and the employer's agents. *Id.* at 310, 315. The Court concluded that common-law agency principles determine when an employer is liable for sexual harassment committed by its employees under the CRA, whereas federal principles of vicarious liability pertinent to title VII are founded in negligence. As such, the Court refused to apply federal principles to sexual harassment claims alleging employer liability under the CRA. *Id.* at 311, 314-316. See *Chambers v Trettco, Inc (On Remand)*, 244 Mich App 614, 618; 624 NW2d 543 (2001) (recognizing that under federal law, once "a plaintiff has established that a supervisor created a hostile working environment, the burden shifts to the employer to disprove vicarious liability for the supervisor's actions," but that "under state law, vicarious liability will be found only where the plaintiff has carried the burden of proving respondeat superior"). Given that clear mandate by our Supreme Court, we cannot apply federal title VII principles of vicarious liability in defining the term "higher management" as it relates to a claim under the CRA. We instead rely on the express language of the CRA and the cited Michigan cases in determining the proper standard. *Chambers, supra*, 463 Mich 303, 316.

Northern of some of her concerns regarding Knapp.[13] All recommendations regarding hiring, firing, pay, job assignments, hours, and discipline of custodians were made by Northuis, Finch, and VanderJagt. Therefore, Northuis, Finch, and VanderJagt are the only individuals involved that could reasonably have their knowledge imputed to defendant. Significantly, plaintiff did not tell any of these individuals about the assaults or sexual harassment until August 1993. Plaintiff testified that before August 1993, she simply complained that Knapp "bothered" her. She concedes that she did not directly state to her "recognized" supervisors that she felt the harassment was of a sexual nature.

Our conclusion that plaintiff did not report any alleged sexual harassment so as to impute knowledge to defendant is not altered when considered in light of defendant's express sexual harassment policy. Defendant's sexual harassment policy states, in pertinent part:

> Any employee who has been subject to or witnessed sexual harassment in the workplace is requested and encouraged to report the sexual harassment to an appropriate supervisor or to the Assistant Superintendent for Personnel and to cooperate in any subsequent investigation.

---

[13] Plaintiff argues that the head custodian should be considered "higher management" as that term is used in *McCarthy* because the head custodian had the ability to assign work. We disagree. If we were to adopt that standard, the conscientious employer desiring to avoid liability would be required to determine its lowest category of employee and train every employee above that category regarding the proper method of addressing or reporting every type of civil rights claim. This places too high a burden on the employer and would likely be ineffective in any event. Moreover, it is unlikely that every skilled and unskilled laborer possesses the management skills required to effectively address such claims.

Under Michigan law, an employer may enhance its employment relationship with its employees through express policies and practices. See *In re Certified Question*, 432 Mich 438, 453-454; 443 NW2d 112 (1989), quoting *Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579, 613; 292 NW2d 880 (1980); see also *Heurtebise v Reliable Business Computers, Inc*, 452 Mich 405, 412-414; 550 NW2d 243 (1996). However, not every written employment policy has the force of a binding contract. See *Heurtebise* and *In re Certified Question*, *supra* at 455-456 (observing that a policy implemented by an employer by nature is a flexible framework for operational guidance, not a perpetually binding contractual obligation). Here, we are not asked to determine whether defendant's sexual harassment policy bound defendant to provide greater protection than is provided under the CRA, and we do not specifically decide the matter. Furthermore, even viewing the sexual harassment policy language in a light most favorable to plaintiff, the policy term "appropriate supervisor" is consistent with "higher management" as that term is used in connection with the CRA.

Significantly, there is no evidence that plaintiff reported any alleged harassment to an "appropriate supervisor" as encouraged in the policy. As previously stated, plaintiff did not notify any "higher management" employee of sexual harassment. In addition, plaintiff's deposition testimony indicates that she did not view Scoby or Cleven as her supervisors.[14] More-

---

[14] Plaintiff's testimony includes:

*[Defendant's counsel]*: And Mr. Cleven was the lead custodian?
*[Plaintiff]*: Yes.

over, plaintiff did not tell Scoby of any specific harassment. She claims that she was "pretty sure" she told Cleven that Knapp raped her. However, given plaintiff's testimony that she did not want Cleven to tell anyone about the incident, it is unreasonable to conclude that plaintiff reported the incident to Cleven as encouraged under the policy for the purpose of stopping such harassment. Scoby's alleged statements to plaintiff further establish that any statement plaintiff made to Cleven regarding alleged harassment was not made in reliance on the policy. As noted by the dissent, plaintiff testified that Scoby told her "[w]e'd handle [any problems with Knapp] in our building; [and that plaintiff] didn't have to go to the super-

---

[*Defendant's counsel*]: He was not your supervisor; right?
[*Plaintiff*]: Right.

*    *    *

[*Defendant's counsel*]: So your testimony is that Mr. Cleven had asked you on several occasions what had happened at the pool regarding Vern Knapp, and ultimately in the fall of '92 you told him that Vern Knapp had raped you at the pool; correct?
[*Plaintiff*]: I believe so. I think so.
[*Defendant's counsel*]: Are you certain of that or not?
[*Plaintiff*]: I'm pretty sure I finally told him that —
[*Defendant's counsel*]: At this point you haven't told your supervisors at Forest Hills; right?
[*Plaintiff*]: Right.

*    *    *

[*Plaintiff*]: And I spoke to the supervisor or maybe Pete—or not supervisor—excuse me—the head custodian, Mark Scoby.

In light of plaintiff's testimony, we do not consider Cleven's statement that he believed he and Scoby were plaintiff's supervisors as material to whether plaintiff complied with defendant's sexual harassment policy. Plaintiff admitted Scoby and Cleven were not her supervisors. Moreover, even if Scoby and Cleven were considered supervisors of plaintiff, no evidence supports the conclusion that they were "appropriate supervisors" under defendant's sexual harassment policy.

visors." Implicit in that statement is Scoby's recognition that he was not an appropriate supervisor to whom to report sexual harassment under the policy. It is undisputed that Cleven was an even lower level employee than Scoby. Under these circumstances, it cannot be said that plaintiff reported any alleged sexual harassment so as to impute knowledge of the harassment to defendant. For these reasons, we conclude that defendant did not have actual knowledge of sexual harassment in the workplace.

### B. DEFENDANT DID NOT HAVE CONSTRUCTIVE KNOWLEDGE OF A HOSTILE WORKPLACE

We must next address whether defendant had constructive knowledge of sexual harassment in the workplace. " 'The employee can demonstrate that the employer knew of the harassment . . . by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge.' " *McCarthy, supra* at 457, quoting *Henson, supra* at 905.

We conclude that the alleged sexual harassment in the present case was not substantially pervasive enough to infer that defendant had notice of it. Accepting as true all of plaintiff's allegations, we note that plaintiff was sexually harassed on four separate occasions over a three-year period. The rape occurred in 1990 or 1991, the sexual assault occurred in 1991, the incident in which Knapp "rubbed up" against plaintiff occurred around 1993, and the final incident occurred in August 1993.

We find no merit in plaintiff's contention that defendant should have known of the sexual harassment on the basis of defendant's knowledge of the prior instances of sexual harassment by Knapp that were

alleged to have occurred in 1985 and 1988, together with plaintiff's generalized complaints. On the basis of information it had gathered, defendant was concerned about plaintiff's situation. As a result, defendant specifically inquired of plaintiff regarding her employment situation. When defendant inquired about plaintiff's "problems," plaintiff did not disclose any information about the assaults or sexual harassment. In fact, plaintiff stated that, with the exception of Cleven a couple of years later, she told no one, including co-workers, about the assaults. Moreover, even though defendant had no information substantiating any assaultive or harassing behavior, defendant specifically inquired whether management could intercede with Knapp on plaintiff's behalf and plaintiff indicated that she did not want defendant to interfere. Plaintiff claimed only that she was being "bothered" and plaintiff maintained she would handle the matter herself. Therefore, even with defendant's knowledge of a prior substantiated complaint of sexual harassment against Knapp in 1988, and a second generalized complaint made in 1988 relating to conduct occurring in 1985, defendant had no basis on which to conclude that sexual harassment relating to plaintiff was occurring before August 1993, because plaintiff made no complaints or statements when specifically questioned about Knapp. See *Chambers v Trettco (On Remand)*, 244 Mich App 614, 618-619; 624 NW2d 543 (2001). Furthermore, because plaintiff remained silent about these incidents immediately after they occurred, defendant could not have learned of the harassment through other employees.[15]

---

[15] In regard to the third incident, Knapp's "rubbing up" against plaintiff, plaintiff testified that she immediately complained to Scoby. In response, Scoby directed plaintiff to another work assignment. There is no evidence to suggest that defendant knew of this incident or that this incident was

In sum, because the rape and sexual assault occurred over a period of two to three years, plaintiff failed to notify her supervisors of the incidents, and plaintiff specifically stated that she was not in need of assistance when defendant inquired whether she needed defendant to intercede with Knapp, the sexual harassment was not, as a matter of law, substantially pervasive enough to put defendant on notice of the sexual harassment.

### C. DEFENDANT HAD NO LEGAL DUTY TO INFORM PLAINTIFF OF KNAPP'S PRIOR ACTS OF SEXUAL HARASSMENT

Finally, plaintiff argues that, had defendant informed her that Knapp had previously been disciplined for sexual harassment, she would have informed defendant of Knapp's wrongful conduct sooner. Plaintiff cites no authority to support the proposition that defendant was under a duty to inform her of prior acts of sexual harassment involving co-workers. We are aware of no statute or case law to support such a position and we decline to impose such a duty on employers.

### CONCLUSION

Plaintiff failed to present evidence to sustain a claim of respondeat superior liability against her defendant employer for sexual harassment undertaken by a co-worker. There exists no evidence that defendant knew or should have known of the existence of sexual harassment in the workplace. There-

---

well known in defendant's work environment so as to impute knowledge to defendant. The incident occurred one time and Scoby immediately remedied the problem by moving plaintiff to another work assignment.

fore, the trial court properly granted summary dispo-
sition in favor of defendant. Affirmed.

HOEKSTRA, J., concurred.

WHITE, J. (*dissenting*). I respectfully dissent from
the majority's determination that there is no genuine
issue of material fact whether defendant had actual
or constructive notice of a hostile workplace.[1]

---

[1] The facts viewed in a light most favorable to plaintiff are that plaintiff
began employment with defendant in December 1988 as a part-time bus
driver, became a permanent bus driver in August 1989, and later applied
for and received a position as full-time custodian. In late February 1990,
plaintiff became the night custodian at defendant's new swimming pool
facility, the Community and Aquatic Center. One of plaintiff's supervisors
at the pool was Kathy Knapp, the wife of another custodian defendant
employed, Vern Knapp (Knapp). Plaintiff worked alone in the pool build-
ing as the night custodian. In early 1988, before plaintiff began employ-
ment with defendant, a female employee of defendant (referred to in the
record as Employee "A"), filed a sexual harassment complaint against
Knapp, for which Knapp was suspended without pay for five days, trans-
ferred, placed on a three-month probation, and told that, should another
incident of that nature occur, his immediate dismissal would be recom-
mended. Plaintiff maintained below that she was unaware of the
Employee "A" incident, while defendant maintained that plaintiff learned
of the incident while she worked at the pool building. Plaintiff testified at
deposition that Knapp raped her on an elevator at the pool facility in April
1990, but that she did not report the rape to defendant because Knapp's
wife was her supervisor and because she was humiliated:

> Had I not worked for his wife and had been new in the building,
> worried about what people would think, being in a new position,
> had I known his history also to have something to—you know,
> there wasn't a witness there. I was ashamed, embarrassed, humili-
> ated by—I didn't know who to tell to be safe and not have it spread
> through the district, and be embarrassed as I finished working
> there for the rest of my life until I retired, I hoped. But his wife
> was my boss, so it was a pretty—it was a pretty awkward situation
> for me.

Beginning around the summer of 1991, plaintiff and Terri Handlin, defen-
dant's Director of Adult and Community Education, who worked at the
pool building, had a number of conversations in which plaintiff said that
while she worked alone at the pool at night she heard noises, suspected
someone was outside the building, and was afraid. Plaintiff testified at

deposition that she complained a lot, including to Kathy Knapp, about wanting security at the pool. Plaintiff was not sure of the source of the noises at the outset, but eventually told Handlin that she had seen Knapp outside the pool building at night, that Knapp had been calling her on her beeper while she was at work, that Knapp had gotten inside the locked pool building, and that she had asked Knapp to leave her alone. Both plaintiff and Handlin testified that plaintiff told Handlin that she wanted to handle the situation herself. Handlin testified that she asked plaintiff if she wanted her to do anything and plaintiff said no. Handlin testified that after several meetings with plaintiff, she notified Linda Schmitt Vander-Jagt, defendant's assistant superintendent of personnel, and Don Finch, defendant's supervisor of buildings and grounds, that plaintiff was "very excited" about the situation but did not want Handlin to do anything about it. Finch testified that he recalled Handlin telling him that plaintiff was complaining that Knapp was paging her on her beeper. Finch testified that he thought that Handlin also mentioned that Knapp was hanging around outside the pool building while plaintiff worked. Finch testified that he thought he mentioned both to his supervisor, Paul Northuis, defendant's director of operations, and to VanderJagt, plaintiff's complaint that Knapp was paging her and hanging around outside the pool building. Finch testified that because of concerns regarding Knapp's behavior, he (Finch), VanderJagt, plaintiff, and, he believed, Northuis, and a union representative, had a meeting, that plaintiff was nervous at the meeting, and that plaintiff asked that nothing be done to Knapp. Finch also testified that he, Handlin, and plaintiff had a meeting, but could not recall whether it was before or after the previously discussed meeting. It is undisputed that before plaintiff complained to Handlin about Knapp, Handlin, Vander-Jagt, and Finch knew of the 1988 sexual harassment complaint Employee "A" had brought against Knapp, and knew that as a result Knapp had been disciplined and warned that there could be no such further incidents. VanderJagt testified that she met with Knapp after the meeting she had with plaintiff, a union representative, and Paul Northuis, even though plaintiff had been adamant about defendant not getting involved, and had not filed a complaint against Knapp. VanderJagt testified that she told Knapp that she had some concerns or had heard rumors, reminded him of the terms and conditions of his continued employment, and let him know that if another incident of a sexual nature occurred, she would fire him. In September 1991, defendant transferred plaintiff to a different location, Northern High School, to work the second shift. Soon after, Knapp requested to transfer to Northern High School and was permitted to do so, apparently by Finch. At Northern, plaintiff's work activities were directed by Mark Scoby, the head custodian at Northern, and Pete Cleven, the lead night custodian at Northern. Plaintiff testified that they were both aware of Knapp's harassment of her at her prior assignment. Plaintiff testified that Knapp continually bothered her and that she complained to Scoby. After an incident in which Knapp rubbed up against plaintiff, which plaintiff also reported to Scoby, Cleven acceded to Knapp's request to work with plaintiff on August 23, 1993, and Knapp apparently exposed himself to

I

Plaintiff concedes that the incidents that led up to the summer 1993 "rubbing up" incident at Northern High School do not impose liability on defendant. She asserts, however, that these incidents should have raised awareness and put defendant on notice of the hostile environment, such that the subsequent August 1993 incident of Knapp exposing himself to plaintiff never should have occurred. I agree.

The pivotal issue is whether Mark Scoby, the head custodian at defendant's Northern High School, and Pete Cleven, the lead night custodian at Northern, were appropriate persons to whom plaintiff could complain. Under the factual circumstances presented here, see n 1, *supra*, including the wording of defendant's own sexual harassment policy, quoted in part

plaintiff while they were working together near the football field. Plaintiff reported the incident, and an investigation ensued. On September 3, 1993, during the investigation, another female custodial employee (referred to in the record as Employee "B") communicated with VanderJagt and filed a sexual harassment complaint against Knapp regarding an incident that occurred on the job in 1985. Employee "B" told VanderJagt and testified at deposition that she had attempted to report the incident to Don Finch in 1988, after she heard that another female custodial employee had been assaulted by Knapp, but the conversation did not get very far because Finch did not listen. Employee "B" testified that she told Finch she had had a problem with Knapp, and that Finch "told me ways that we could avoid problems like that," including cutting her hair and gaining weight. She testified that what she thought Finch was telling her was that she should not act so feminine. Defendant's investigation of plaintiff's and Employee B's complaints in September 1993 resulted in Knapp's employment being terminated in October 1993. Except for a brief return to work, plaintiff has not worked since the August 1993 assault. Plaintiff's response to defendant's motion for summary disposition noted that she was not alleging that defendant was subject to liability for the rape, but, rather, that evidence of defendant's actions and failure to act before 1993 were admissible to prove the extent and nature of damages plaintiff suffered as a result of the August 1993 assault.

in the majority opinion, I conclude that there is a genuine issue of material fact.

Plaintiff testified that Scoby and Cleven were aware of Knapp's prior harassment,[2] and that, nonetheless, Knapp was allowed to transfer to Northern High School and she was assigned to work with him. Plaintiff contends that Scoby and Cleven had control over her day-to-day duties and that she complied with defendant's sexual harassment policy by speaking to them about Knapp. Plaintiff testified that around the time of Knapp's transfer to Northern, Scoby came and talked to her about the transfer, that she told him that she was "pissed off, but that he [Scoby] better keep him the [sic] other side of the building." Plaintiff testified that Scoby told her that there was a meeting with Knapp, that Knapp was told to stay away from her, and that "[w]e'd handle it there in our building; [and that plaintiff] didn't have to go to the supervisors." Plaintiff testified that Scoby made this statement on several occasions.

Plaintiff testified that once Knapp started working at Northern, she complained about Knapp several times to Scoby, including telling Scoby that Knapp

---

[2] Plaintiff testified that when she started at Northern, her fellow custodial employees had heard "that something had happened [to plaintiff] at the pool." Plaintiff testified that Scoby asked her specifically what had happened at the pool and she responded that "it was bad." Plaintiff testified that right after she started at Northern, Knapp "was trying to apply for jobs in other parts of the district, and people were talking about it. And I remember saying to Mark [Scoby], 'I, you know, hope that he never comes to this building,' " and that Knapp "better not come on my side of the building," and that Scoby responded that she had nothing to worry about and that if there was any problem "we'll take care of it here." Plaintiff testified that although she did not state that she had been raped or assaulted, she was sure that Scoby "got the picture" and that Scoby "said himself that he knew about Vern's history and he would watch for me. He would watch out for me."

was constantly bothering her. Plaintiff testified that Scoby told her he would talk to Knapp and take care of it.

Plaintiff testified that she complained to Scoby immediately after Knapp rubbed up against her in the classroom, and within minutes Scoby put her on another assignment. That Scoby was an appropriate person for plaintiff to complain to is also supported by a letter Handlin wrote plaintiff when plaintiff was transferred to Northern High School in 1991.[3] That letter states in pertinent part:

> I would like to wish you the best of luck at Northern High School. I believe that you will be happier on a more consistent schedule. *It will be helpful to have someone available to be interacting with you on a supervisory level and above all you will not have to be afraid while you are working.* [Emphasis added.]

Scoby testified at deposition that plaintiff told him that she did not want to work with Knapp once he transferred to Northern. He testified that he had notice of Knapp's transfer to Northern before it occurred, but that he did not recall asking plaintiff what she thought about Knapp transferring. Scoby testified that Knapp's responsibilities at Northern included gathering the trash in the building, which took him through the building, including plaintiff's area. Scoby testified that he recalled that, before the rubbing-up incident, plaintiff had told him something like that Knapp was hanging around her.

---

[3] Plaintiff attached the letter to her response to defendant's motion for summary disposition. The letter is on the letterhead of Forest Hills Community and Aquatic Center.

Cleven testified that Scoby was his supervisor and that he (Cleven) and Scoby were two of plaintiff's supervisors. He testified that as lead night custodian, he had an area to clean, but also supervised the night crew and assigned work. Cleven testified that Knapp came to him and asked to be assigned with plaintiff at the football field on the day Knapp exposed himself to plaintiff. Cleven testified that at the time he assigned plaintiff and Knapp to work together, he knew that a prior complaint of sexual harassment had been made against Knapp by Employee "A," and that Knapp had been transferred and almost lost his job as a result. Cleven also testified that plaintiff had previously told him that while she worked at the pool Knapp had "come around every now and then and kind of bugged her," that he knew that Knapp was "interested in" plaintiff, and knew that plaintiff was uncomfortable working with Knapp. Cleven testified that he nonetheless assigned plaintiff and Knapp to work together. He testified that he told VanderJagt and Northuis, after plaintiff complained in August 1993, that he thought assigning plaintiff and Knapp was okay because "he didn't think Vern [Knapp] would be that dumb." Cleven testified:

> At the time when Vern asked if Vicki could work with him on the football field, it just didn't occur to me at that time that there would be a problem, and she certainly didn't give any inclination [sic] that she had a problem going down to work with him.

II

In *Chambers v Trettco, Inc*, 463 Mich 297, 319; 614 NW2d 910 (2000), the Supreme Court ruled that

"notice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring."[4] In so holding, the Supreme Court did not require that "higher management" would have been aware of a substantial probability that sexual harassment was occurring. The term "higher management" appears in *McCarthy v State Farm Ins Co*, 170 Mich App 451; 428 NW2d 692 (1988), decided twelve years before *Chambers* was decided.[5] While the nature of the supervisory responsibilities of the person or persons notified of the harassment may be a relevant consideration in evaluating whether the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that harassment was occurring, *Chambers* enunciates the test as one requiring the evaluation of the totality of the

---

[4] Regarding determining the adequacy of notice to an employer in a hostile environment sexual harassment claim, the *Chambers* Court stated:

> [W]e observed in *Radtke* [*v Everett*, 442 Mich 368; 501 NW2d 155 (1993)] that *a reasonableness inquiry, accomplished by objectively examining the totality of the circumstances, is necessary to fulfill the purposes of the Michigan Civil Rights Act. Id. at 386-387. This also holds true for an inquiry into the adequacy of notice. Therefore, notice of sexual harassment is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring.* See *Perry v Harris Chernin, Inc*, 126 F3d 1010, 1014 (CA 7, 1997) (the law against sexual harassment is not self-enforcing; although an employee has no duty under the law to report discriminating harassment, an employer cannot be expected to correct such harassment unless the employer has reason to know that it is occurring). [*Chambers, supra* at 319 (emphasis added).]

[5] *McCarthy*, does not define "higher management."

circumstances and does not speak of "higher management."

In the instant case, the harassment was by a co-worker. Both plaintiff and the co-worker had the same immediate supervisors. Plaintiff presented evidence that the supervisors were aware of the harassment. It was for the trier of fact to determine whether the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that sexual harassment was occurring.

The majority's formulation for determining whether notice may be fairly imputed to the employer does not take into account the innumerable variations in workplaces, such as multiple levels of supervisory and managerial personnel; workers being at different locations, perhaps even different cities, or on different shifts than "management employees who have actual authority to effectuate change in the workplace"; and that the employer's sexual harassment policies may neither ask nor require workers to report harassment to persons with such "actual authority" over the harassing employee. Additionally, it is neither reasonable nor workable to require an employee subjected to workplace harassment to determine who in the chain of command has "actual authority to effectuate change in the workplace" of the harassing employee. There is no support for the imposition of such a requirement.

III

Defendant's written policy barring sexual harassment states that any employee who has been subject

to sexual harassment in the workplace "is requested
and encouraged to report the sexual harassment *to
an appropriate supervisor* or to the Assistant Super-
intendent for Personnel and to cooperate in any sub-
sequent investigation." (Emphasis added.) The policy
does not define "appropriate supervisor." See *Parkins
v Civil Constructors of Illinois, Inc*, 163 F3d 1027,
1035 (CA 7, 1998) (if employer's policy does not
clearly specify who can receive complaints, or an
identified person is not easily accessible, an employer
can receive notice from a department head or some-
one that plaintiff "reasonably believed was authorized
to receive and forward (or respond to) a complaint of
harassment"). In the instant case, Scoby (and Cleven)
worked at the same location as plaintiff and Knapp,
and VanderJagt did not. Scoby told plaintiff that he
would handle her complaints against Knapp and that
she need not go to a person higher than he was, and
testified that his duties included handling problems
that arose between custodial personnel. Scoby reas-
signed plaintiff after Knapp rubbed up against her in
1993, before the incident in August 1993 when Knapp
exposed himself to plaintiff. Defendant presented no
evidence that, although Scoby was vested with
authority to determine the work assignments of the
custodial staff, he was not empowered to receive
complaints of sexual harassment.[6]

   In sum, plaintiff presented evidence that Scoby had
the authority to assign her custodial duties, told her
to report any problems she had with Knapp to him

---

[6] I do not agree that implicit in Scoby's statement to plaintiff that he
would handle any problems in the building and that she need not go to
the supervisors is a recognition by Scoby that he was not an appropriate
supervisor to whom to report sexual harassment under the policy.

and that he would take care of them, and reassigned plaintiff when she told him that Knapp had rubbed up against her. Scoby acknowledged that he handled problems that arose between the custodial personnel. Handlin's letter to plaintiff at the time she was transferred to Northern indicates that plaintiff was expected to interact with Scoby as someone on a supervisory level. Further, Scoby told plaintiff that she need not report the problems she had with Knapp to a person higher in the chain of command than he was.

Scoby was Cleven's superior, and it is clear that at Knapp's request, Cleven, in the exercise of his actual authority to supervise the night crew and assign work, assigned Knapp to work with plaintiff at the football field on the day Knapp exposed himself to plaintiff. Under the circumstances, I conclude that there is a genuine issue of material fact whether plaintiff reported the harassment to an appropriate supervisor.

IV

Plaintiff further contends that defendant's knowledge that Knapp had harassed others is relevant to both the issue of notice and whether defendant acted reasonably in transferring Knapp to Northern and assigning him to work with plaintiff. I agree with plaintiff that defendant's knowledge that Knapp had previously harassed others may be considered in deciding whether defendant had notice of Knapp's harassing conduct. See *Dees v Johnson Controls World Services, Inc*, 168 F3d 417, 422-423 (CA 11, 1999), where the court concluded that there were material issues of fact whether the defendant had

notice of the harassing conduct before the plaintiff
complained, noting that the plaintiff had alleged that
a human resources employee had told her that per-
sons in the plaintiff's department were "up to their
old tricks again," and that a similar investigation had
been conducted several years earlier, and there was
an allegation that another employee had complained
to the human resources department on the plaintiff's
behalf; see also Note, *Notice in hostile environment
discrimination law*, 112 Harv L R 1977, 1979 (1999)
(stating that "[t]he question whether an employer had
actual notice of a hostile environment can be
answered by examining whether a legally appropriate
representative of the employer was aware of facts—
*via any channel of communication*—indicating the
possibility of a hostile environment" [emphasis
added]).

Defendant's higher management, including Vander-
Jagt, Finch, and Northuis, was aware, before plaintiff
raised any concerns regarding Knapp, of Knapp's
involvement in the Employee "A" incident, his resul-
tant discipline, and that he had been admonished in
writing that his immediate dismissal would be recom-
mended if another incident of that nature occurred.
Plaintiff also presented evidence that, after Employee
"A" complained about Knapp, Employee "B"
attempted to tell Finch that Knapp had sexually
harassed her, and that Finch was not receptive.

Having in mind that plaintiff does not seek to
impose liability on defendant for incidents that
occurred before 1993, this information is pertinent to
the issue whether plaintiff's complaints regarding
Knapp provided sufficient notice that her complaints
were sexual in nature. Plaintiff's pre-1993 complaints

included that Knapp paged her continually while she was at work, made noises outside the pool facility at which she worked alone at night, gained entrance to the locked pool facility while plaintiff worked, made plaintiff fearful of being alone in the building, and that plaintiff told him to leave her alone.

The trier of fact could properly conclude that a reasonable employer would have been aware from these complaints, in light of Knapp's history, that there was a substantial probability that plaintiff was being sexually harassed. *Chambers, supra.*

I conclude that there is a genuine issue of material fact whether defendant had adequate notice of a hostile environment.

I would reverse.