# STATE OF MICHIGAN

# COURT OF APPEALS

LEON BURNS,

       Plaintiff-Appellant,

v

CITY OF SAGINAW,

       Defendant-Appellee.

UNPUBLISHED
November 3, 2016

No. 327864
Saginaw Circuit Court
LC No. 14-022817-CD

Before: STEPHENS, P.J., and SERVITTO and GLEICHER, JJ.

PER CURIAM.

Plaintiff Leon Burns, an African-American Saginaw police officer, sued the city of Saginaw in federal court under Title VII, alleging race discrimination, hostile work environment, and retaliation. His federal court complaint restated the same claims under the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq*. The federal district court granted summary judgement in Saginaw's favor as to Burns' Title VII and retaliation allegations. Burns' state-law claims for race discrimination under a direct evidence theory were dismissed without prejudice. Burns then filed this action in the Saginaw Circuit Court averring that he was fired and denied a promotion due to his race and suffered workplace harassment. He confined his proffered proofs to direct evidence of discrimination.

The circuit court granted summary disposition to Saginaw, ruling that the statements constituting direct evidence of discrimination were inadmissible hearsay and "isolated and remote from the actual employment action in dispute." We affirm for reasons different than those expressed by the circuit court.

I

Leon Burns has worked as a Saginaw police officer since 1999. In December 2008, Burns and a neighbor, Mr. Ewald, quarreled while Burns was off-duty and operating a snowplow. Ewald claimed that Burns pushed snow onto his property and then struck him with the plow. Burns denied any assault and insisted that Ewald had used racial epithets. Ewald filed a formal complaint. The Saginaw Police Department ordered Sergeant Anjanette Tuer to conduct an internal affairs investigation of the incident.

On March 3, 2009, a jury found that Saginaw had discriminated against a different Saginaw police officer and awarded the officer a substantial sum. Burns asserts that shortly

-1-

thereafter, Sergeant Tuer called him and requested that he "make a comment that she was not a racist." When Burns refused, Tuer "went into this tirade about how she couldn't fucking stand fucking black people and that my black ass would live to remember this day."

On March 19, 2009, Tuer interviewed Burns regarding the snowplow event. Burns received no formal discipline and was instead referred for counseling. A few weeks later he submitted a formal complaint to City Manager Darnell Early and Personnel Director Ralph Carter asserting that the counseling order constituted racial discrimination. Meanwhile, Chief of Police Gerald Cliff requested that the Michigan State Police undertake its own investigation of the snowplow incident. According to unrebutted evidence submitted by Saginaw, referrals to an outside agency are routine when a police officer is implicated in criminal activity. Based on a report prepared by a Michigan State police sergeant, the Saginaw prosecutor charged Burns with reckless driving. Burns pleaded guilty to careless driving.

The Saginaw Police Department launched a second internal affairs investigation of Burns in October 2009. A different internal affairs investigator concluded that Burns had committed several attendance violations and he was suspended for three days without pay. According to Burns, another officer heard Chief Cliff declare "something to the effect that . . . any nigger that stood up against him, would live to regret it until the day Chief Cliff fired him." The Civil Service Commission later overturned Burns' suspension as it had been imposed more than 90 days after the department should have known of the infractions. See MCL 38.514.

A third internal affairs investigation followed close on the heels of the second. A private citizen complained that Burns had falsely issued an electronic ticket for running a red light. Tuer and the Michigan State Police investigated this allegation, and confirmed the citizen's account. In February 2010, Chief Cliff recommended Burns' termination from the force. City Manager Early approved this recommendation. That decision, too, was ultimately reversed by the Civil Service Commission on the same ground as the previous disciplinary action: it was imposed too late. When Burns returned to work he was assigned to a different position and his application for a promotion was denied.

In August 2011, Burns filed a federal court action raising federal and state-law discrimination and retaliation claims. Saginaw moved for summary judgment. The district court initially dismissed the case in its entirety, finding that Burns had failed to exhaust necessary administrative remedies with respect to his hostile work environment and retaliation claims. Burns' remaining allegations fared no better. The district court examined the direct evidence supporting discrimination and found Tuer's 2009 statement " not relevant" as it had been omitted from Burns' Equal Employment Opportunity Commission charge. In the district court's estimation, Burns' remaining evidence failed to establish the fourth element of a prima facie case under *McDonnell Douglas Corp v Green*, 411 US 792; 93 S Ct 1817; 36 L Ed 2d 668 (1973), that similarly situated employees were treated more favorably than he had been.

Burns sought reconsideration as to his state-law claims and his federal claim for retaliation. On reconsideration, the federal court again dismissed Burns' state and federal retaliation claims, but found its dismissal of the remaining state-law claims unjustified. The court observed: "it is possible his alleged direct evidence [of discrimination] may be relevant to his state law claims for discrimination." Burns claimed an appeal of the district court's dismissal

of his retaliation claim in the United States Court of Appeals for the Sixth Circuit, which eventually affirmed. *Burns v Saginaw*, 601 Fed Appx 353 (CA 6, 2015).

Burns filed his complaint in this case in 2011. In response to Saginaw's motion for summary disposition, Burns agreed that he was collaterally estopped from pursuing any claims premised on indirect evidence. The circuit court rejected his attempt to establish his discrimination case with direct evidence, finding that neither of the racially derogatory statements on which Burns relied was "made by the decision-maker, City Manager Darnell Early," and neither had accompanied an adverse employment action. "Most importantly," the circuit court found, "both of these statements upon which Burns relies are inadmissible hearsay." The circuit court denied Burns' motion for reconsideration and he now appeals.

II

We review a trial court's decision on a motion for summary disposition de novo. *Zaher v Miotke*, 300 Mich App 132, 139; 832 NW2d 266 (2013).

> A motion under MCR 2.116(C)(10) tests the factual support of a plaintiff's claim. Summary disposition is appropriate under MCR 2.116(C)(10) if there is no genuine issue regarding any material fact and the moving party is entitled to judgment as a matter of law. In reviewing a motion under MCR 2.116(C)(10), this Court considers the pleadings, admissions, affidavits, and other relevant documentary evidence of record in the light most favorable to the nonmoving party to determine whether any genuine issue of material fact exists to warrant a trial. A genuine issue of material fact exists when the record, giving benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ. [*Id.* at 139-140 (quotation marks and citations omitted).]

"The ultimate question in an employment discrimination action is whether the plaintiff was the victim of intentional discrimination." *Hecht v Nat'l Heritage Academies, Inc*, __ Mich __; __ NW2d __ (Docket No. 150616, decided July 26, 2016), slip op at 17. Generally, a plaintiff may support a discrimination claim with direct and circumstantial evidence. Direct evidence "proves impermissible discriminatory bias without additional inference of presumption." *Id.* at 18 n 34. When a plaintiff relies solely on circumstantial or indirect evidence, however, he must establish a prima facie case based on the burden-shifting paradigm set forth in *McDonnell Douglas*. Here, Burns' agrees that he is collaterally estopped from proceeding under the *McDonnell Douglas* evidentiary formulation based on the federal court's finding that he cannot satisfy one of its prongs. Accordingly, we focus on the direct evidence he proffers.

III

Burns first contends that when dismissing his state-law claim of racial discrimination without prejudice, the federal court necessarily found direct evidence of discrimination establishing a factual dispute regarding whether a discriminatory animus tainted Saginaw's employment actions. We do not read the federal court's opinion so generously. In dismissing

Burns' federal direct evidence claims on exhaustion grounds, the federal court stated that Burns "is not required by Michigan law to exhaust any claims before filing a civil lawsuit, and thus it is possible his alleged direct evidence may be relevant to his state law claims for discrimination." *Burns v City of Saginaw*, unpublished opinion of the Eastern District of Michigan, issued April 9, 2014 (Docket No. 11-13815), unpub op at 8. The federal court's use of the word "alleged" before "direct evidence" belies Burns' argument. The federal court did not declare that factual issues existed; it simply allowed Burns the opportunity to pursue his direct evidence claims in state court.

IV

Burns posits that two strands of direct evidence preclude summary disposition in Saginaw's favor: (1) Tuer's comment that she "couldn't fucking stand fucking black people" and that Burns "would live to remember this day," and (2) Chief Cliff's statement to another officer, outside Burns' presence, that "any nigger that stood up to him would live to regret it until the day Chief Cliff fired him." The latter statement is inadmissible hearsay, so we will not consider it.

Even assuming that Tuer's statement constitutes direct evidence of discrimination, Burns cannot establish that racial discrimination proximately caused the adverse employment actions he identifies. Tuer did not make the decision to fire Burns or to deny him a promotion, and Burns has presented no evidence from which a factfinder could reasonably conclude that Tuer's racial animus motivated Cliff's decisions in those regards.

A decision-maker's reliance on racially motivated input from a subordinate employee may render the employer liable for the subordinate's racism. Imputing liability to a principal based on a non-decisionmaker's racial animus is colloquially referred to as the "cat's-paw" or "rubber stamp" doctrine. Under this model, a plaintiff seeks "to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision." *Staub v Proctor Hosp*, 562 US 411, 415; 131 S Ct 1186; 179 L Ed 2d 144 (2011).[1] Based on tort and agency law principles, *id.* at 417-419, *Staub* accepted the existence of such liability. The Court held, "When a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by discrimination, discrimination might perhaps be called a 'factor' or a 'causal factor' in the decision." *Id.* at 418-419. The "partly" aspect of the Supreme Court's holding turns on evidence of proximate cause. Proximate cause requires a *direct* relationship between the injury asserted (here, the adverse employment actions) and the conduct alleged (Tuer's statement). The Supreme Court explained:

> Animus and responsibility for the adverse action can both be attributed to the earlier agent (here, Staub's supervisors) if the adverse action is the intended

---

[1] The plaintiff in *Staub*, an army reservist, filed suit against his employer for terminating his employment based on antimilitary animus in violation of the Uniform Service Employment and Reemployment Act, 38 USC 4301 *et seq*. The act prohibits an employer from terminating an individual's employment if the individual's military obligations are "a motivating factor in" the decision. 38 USC 4311(c).

consequence of that agent's discriminatory conduct. So long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable . . . . And it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm. Proximate cause requires only "some direct relation between the injury asserted and the injurious conduct alleged," and excludes only those "link[s] that are too remote, purely contingent, or indirect." We do not think that the ultimate decisionmaker's exercise of judgment automatically renders the link to the supervisor's bias "remote" or "purely contingent." The decisionmaker's exercise of judgment is also a proximate cause of the employment decision, but it is common for injuries to have multiple proximate causes. [*Id.* at 419 (citations omitted).]

This approach makes sense, posited the Supreme Court, because employers "often allocate[]" duties among its managers and therefore any employment decision will be based on assessments and reports of intermediate supervisors. No employer should be able to purposefully shield itself from liability by allocating its duties in this manner. *Id.* at 420. *Staub* concluded, "Since a supervisor is an agent of the employer, when he causes an adverse employment action the employer causes it; and when discrimination is a motivating factor in his doing so, it is a 'motivating factor in the employer's action.' " *Id.* at 421. Ultimately, "if a supervisor performs an act motivated by [discriminatory] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." *Id.* at 422. Thus, under a cat's paw analysis, Tuer's racial animus may be imputed to Cliff if Burns can demonstrate that Tuer intended to cause an adverse employment action and that her action represented a proximate cause of the adverse actions undertaken by Cliff.

We have assumed that Tuer's racial epithet combined with her threat that "you will remember this day" suffices to directly establish her animus. But Burns has offered no proof that Tuer contributed in a direct manner to Cliff's decisions regarding Burns' employment. In his appellate brief, Burns asserts that "the discharge relied heavily upon the Internal Affairs investigation" conducted by Tuer. But no evidence supports this claim. The snippets of testimony from Cliff submitted to the circuit court contain no hint that Cliff relied on reports or information supplied by Tuer when making employment decisions related to Burns. The circuit court record does not include any such data. Other than supposition that Tuer played a role because she twice interviewed Burns as part of internal affairs investigations, Burns has offered nothing to support that Tuer's input proximately caused Cliff to terminate Burns, or to fail to promote him. Given this evidentiary vacuum, we cannot conclude that Burns has established a legitimate factual dispute regarding whether Tuer's racial animus was a motivating factor in Cliff's employment actions. Absent this link, Burns' race discrimination case fails.

V

Burns maintains that factual disputes precluded summary disposition of his hostile work environment claim, which he predicates entirely on Tuer's statement. Burns' failure to report Tuer's statement to anyone in the police department's management ranks condemns his claim.

A hostile work environment exists where an employee experiences harassment so pervasive that it interferes with his employment or "create[s] an intimidating, hostile, or offensive work environment." *Radtke v Everett*, 442 Mich 368, 385; 501 NW2d 155 (1993). "The essence of a hostile work environment action is that 'one or more supervisors or co-workers create an atmosphere so infused with hostility toward members of one sex [or race] that they alter the conditions of employment for them.' " *Id*. (citation omitted). An employer's liability for creating or tolerating a hostile work environment hinges on whether the employer had notice of the harassment. *Id*. at 396.

An " 'employee can demonstrate that the employer knew of' " the hostile work environment " 'by showing that [he or] she complained to higher management of the harassment' " or by showing that the harassment was pervasive, " 'which gives rise to the inference of knowledge or constructive knowledge.' " *Sheridan v Forest Hills Pub Sch*, 247 Mich App 611, 621; 637 NW2d 536 (2001), quoting *McCarthy v State Farm Ins Co*, 170 Mich App 451, 457; 428 NW2d 692 (1988), overruled in part on other grounds *Norris v State Farm Fire & Cas Co*, 229 Mich App 231; 581 NW2d 746 (1998). "Higher management" means "someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the offensive employee." *Sheridan*, 247 Mich App at 622.

Burns never complained to higher management about Tuer. While he did protest what he perceived as racial discrimination in general beginning in April 2009, he did not specifically mention the statement by Tuer. Nor has he otherwise demonstrated pervasive harassment. During the 15 years Burns served as a Saginaw police officer, he points only to the single statement by Tuer as evidence supporting his hostile work environment claim. This isolated statement does not demonstrate a work atmosphere pervasively poisoned by racism.

We affirm.


/s/ Cynthia Diane Stephens
/s/ Deborah A. Servitto
/s/ Elizabeth L. Gleicher