**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0199n.06
Filed: March 18, 2005

**No. 03-2373**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| Amin Hussain, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| Plaintiff-Appellant, | ) | STATES DISTRICT COURT FOR THE |
| | ) | WESTERN DISTRICT OF MICHIGAN |
| v. | ) | |
| | ) | |
| Highgate Hotels, Inc., et al., | ) | OPINION |
| | ) | |
| Defendants-Appellees. | ) | |

**Before: GUY and ROGERS, Circuit Judges, and DOWD, District Judge[*].**

**Dowd, District Judge.** Plaintiff-Appellant Amin Hussain appeals the District Court's

dismissal of his suit for national origin and religious discrimination in violation of Michigan's

Elliot-Larsen Civil Rights Act (ELCRA). Hussain alleges that his former employer, Defendant-

Appellee Highgate Hotels, Inc. terminated him and subjected him to a hostile work environment

because he is Pakistani and practices the Shia Imamya Ismaili sect of Islam. Because Hussain

has not presented direct evidence of discrimination, cannot establish a prima facie case of

discrimination or that Highgate's proffered reason for his termination was pretextual, and cannot

establish that Highgate had notice of any purportedly hostile work environment, the judgment of

---

[*]The Honorable David D. Dowd, Jr., United States District Judge for the Northern
District of Ohio, sitting by designation.

the District Court is affirmed.

# I

Plaintiff-Appellant Amin Hussain is a Pakistani who practices the Shia Imamya Ismaiali sect of Islam. (J.A. 274-275.) On April 22, 2002, Defendant-Appellee Highgate Hotels, Inc. fired Hussain from his controller position at the Hotel Pontchartrain in Detroit, Michigan, which is owned by Defendant-Appellee Pontch Limited Partnership, when he failed to complete his personal improvement plan (PIP). (J.A. 247.) Hussain also had served simultaneously as the controller for the Detroit Best Western, which was also owned by Pontch. Pontch is owned by Jaffer Khimji, Mahmood Khimji, and Mehdi Khimji, East Africans who, like Hussain, practice the Shia Imamya Ismaiali sect of Islam. (J.A. 176.) As the controller of the Pontchartrain Hotel and Best Western, one of Hussain's primary responsibilities was performing bank reconciliations, which is similar to balancing a checkbook. (J.A. 198.) However, throughout his employment, Hussain had problems relating to the accuracy and timeliness of his bank reconciliations. (See J.A. 215, 235-237.)

In 2001, Teri Marshalek, Highgate's Corporate Controller, decided that all Highgate hotels would begin using a new software package called Dynamics in November of 2001 to complete their bank reconciliations. (J.A. 115.) The transition was necessary because Highgate's software vendor had informed Marshalek that it would no longer support the software Highgate was then using. In addition, Marshalek concluded that having all hotels on one system would

allow for increased efficiency. (J.A. 115.) In August of 2001, Highgate informed its controllers that it would conduct a seminar in Dallas, Texas from September 25-27, 2001 to train them on the Dynamics software. (J.A. 237.)

In the wake of the September 11, 2001 terrorist attacks, Hussain asked Paul Wegert, General Manager of the Hotel Pontchartrain, to be excused from attending the Dallas seminar due to his concerns for his safety and that of his family. (J.A. 276.) Wegert later told Hussain that he called Tony DiRico, President of Highgate Hotels, who called Marshalek, who said that there would be no excuses from the meeting. (J.A. 277.) Marshalek, however, did excuse Shranjit Sikka, an Asian Indian Sikh and controller of a Highgate hotel in Lexington, New York. (J.A. 238.) Sikka personally asked Marshalek to be excused from the meeting due to his similar fears, and Hussain admits that he never directly asked Marshalek to be excused. (J.A. 238.)[1] As his request to be excused was denied, Hussain attended the seminar.

At a dinner held in conjunction with the seminar, Marshalek stated that "she had been given 'only a slap on the wrist' at a former job when she expressed her views about 'How there are *too many immigrants* in the country, *too many brown people*." (J.A. 296.) She went on to explain that she was referring to Mexicans. (J.A. 296.) Later, while Hussain and others were watching coverage of the September 11th attacks, Highgate's Regional Controller Roger Patrick said that he "didn't understand why the U.S. Government just doesn't drop an A-bomb [on

---

[1]Marshalek claims to never have received any request from Hussain or anyone on his behalf asking to be excused.( J.A. 116.)

Afghanistan].” (J.A. 279.)

After returning to Detroit, the catering manager Kevin G. told Hussain that he should come to work on Halloween dressed as Osama bin Laden. (J.A. 297.) Additionally, Wegert and other staff repeatedly referred to Hussain as “Taliban.” (J.A. 297.) Hussain complained to Wegert about this conduct, but to no one else. (J.A. 297.) Diane Tunstall, the Human Resources Director at the Hotel Pontchartrain, heard Wegert call Hussain “Taliban.” (J.A. 289-290.) However, she never heard Hussain complain about it. (J.A. 290.) Indeed, Tunstall testified that she, Wegert, and Hussain were friends and considered it “a joking kind of thing.” (J.A. 290.) She stated that they “were always joking and laughing and goofing around and [she] certainly had no reason to think that [Hussain] was offended by it.” (J.A. 290.)

In December of 2001, Zaher Juma and Patrick visited the Best Western and Hotel Pontchartrain in Detroit. (J.A. 241.) According to Marshalek, the purpose of this trip was to train and assist Hussain in several areas dealing with the Best Western, but would include some work at the Pontchartrain. (J.A. 121.) Hussain, however, contends that the purpose of this visit was to audit him. (J.A. 240.) As a result of this visit, Patrick prepared a report which stated that the Pontchartrain needs to reconcile bank accounts as soon as possible and complete bank reconciliations. (J.A. 241.)

Hussain received a 2% performance increase in salary and a $5000 bonus based on “discretionary factors such as timeless [sic] of reports, receivables, control compliance, and other

factors" in January of 2002. (J.A. 298-299.) That same month, he learned from a member of his staff that his position had been listed as vacant on a job seekers' web site. (J.A. 301-302.) Barick posted the position on the web site because Hussain had indicated to him that he was considering resigning his position and because he was aware of Hussain's performance problems. (J.A. 318.) Marshalek, however, informed individuals interviewing for the position that it was not vacant, but may become vacant in the future. (J.A. 319.) Despite Hussain's protests, the position was not removed. (J.A. 301-302.)

In February of 2002, Barick offered Hussain the general manager position at the Detroit Best Western (J.A. 162.) Barrick claims he made this offer because of Hussain's problems at the Hotel Pontchartrain. (J.A. 162-163.) While the position would have been a promotion for Hussain, he declined the offer because of the impending sale of the Best Western. (J.A. 244.)

On February 25, 2002, Hussain stated that he was ready to start the November bank reconciliations in Dynamics, although his system had "gone live" with Dynamics on November 23, 2001. (J.A. 240, 245.) Around March 1, 2002, Marshalek relieved Hussain of his controller duties at the Best Western so that he could focus on the Hotel Pontchartrain. (J.A. 245.) Marshalek also placed Hussain on a performance improvement plan (PIP) on March 7, 2002. (J.A. 245.) She contends that under the PIP bank reconciliations were to be completed by March 31, 2002. (J.A. 117.) Hussain contends that Marshalek had given him until April 30, 2002 to complete the bank reconciliations in Dynamics. (J.A. 246.) Her memo detailing the plan states as follows:

5

> **Bank Recs**- All bank recs (excpet Payroll & TA [travel agent]) are to be completed through the end of February by **March 31st**. This includes reconciliations that are to be completed in Dynamics. As we discussed the A/R and A/P clerks are prohibited from working on these reconciliations due to internal control procedures and are to be completed by you or the assistant controller.

> **Payroll & TA Recs**- These accounts have never been reconciled. As agreed you will go back 6 months (September 2001) and bring the reconciliation forward in Excel format. This is to be completed by **April 30th**.

> **Misc. Balance Sheet Accounts-** All balance sheet accounts are to be reconciled on a monthly basis. Each account is to be kept in a file folder with all documentation to back-up the balance. I am forwarding to you again the format for these reconciliations, which was originally sent in August 2001. These are to be forwarded to me one month following the end of the quarter. **(April 30th)**.

(J.A. 308.) Hussain did not complete all of the bank reconciliations in Dynamics by March 31, 2002, nor did he have them completed when he was terminated on April 22, 2002. (J.A. 246.)

In April 2002, Marshalek recommended to Barick that Hussain be discharged purportedly because of his performance problems and failure to complete the PIP tasks in a timely manner. (J.A. 117.) Barick had already stated on March 27, 2002 in an e-mail responding to Marshalek's complaints regarding Hussain's handling of travel agent commissions that Hussain "has to go." (J.A. 303.) After notifying the Khimjis of Marshalek's recommendation and consulting with them, Barick approved the decision to discharge Hussain. (J.A. 163.) On April 22, 2002, Marshalek informed Hussain that he was terminated. (J.A. 221.) Marshalek then hired Joan Yezebeck, who is Lebanese, to replace Hussain. (J.A. 247.)

On August 14, 2002, Hussain initiated the instant action by filing a complaint in Michigan state court alleging national origin and/or religious discrimination and the creation of a hostile work environment in violation of Michigan's Elliot-Larsen Civil Rights Act. (J.A. 11.) Defendants removed this action to the United States District Court for the Eastern District of Michigan on November 6, 2002, asserting diversity jurisdiction. (J.A. 8-10.) Highgate filed its Motion for Summary Judgment on May 15, 2003.  After Hussain filed a Response and Highgate its Reply, the District Court held a hearing on this Motion. (J.A. 4.)  On September 16, 2003, the District Court granted the Defendants' Motion for Summary Judgment. (J.A. 4.)  Hussain now appeals this judgment.

**II**

This Court reviews a district court's granting of summary judgment de novo. <u>Blackmore v. Kalamazoo County</u>, 390 F.3d 890, 894-895 (6th Cir. 2004) (citing <u>Terry Barr Sales Agency, Inc. v. All-Lock Co.</u>, 96 F.3d 174, 178 (6th Cir.1996)).  Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  This court must view the evidence and draw all reasonable inferences in favor of the non-moving party.  <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).

**III**

Hussain appeals the District Court's grant of summary judgment on his claim of religious and national origin discrimination. Michigan's Elliot-Larson Civil Rights Act makes it unlawful for an employer to "discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion . . . [or] national origin." M.C.L. §37.2202(1)(a). This prohibition includes the creation of a hostile work environment. See Malan v. Gen. Dynamics Land Sys., Inc., 538 N.W.2d 76, 77 (Mich. Ct. App. 1995). Here, Hussain alleged that Highgate terminated him because he is a Muslim and/or a Pakistani. Additionally, he claims that Highgate's employees created a hostile work environment for him on the basis of his religion and/or national origin.

## A. Discriminatory Termination

The Court will first address Hussain's discriminatory termination claim. Under ELCRA, a plaintiff may prove discriminatory treatment by presenting direct evidence or by presenting indirect or circumstantial evidence. Sniecinski v. Blue Cross & Blue Shield of Mich., 666 N.W.2d 186, 192 (Mich. 2003). The District Court concluded that Hussain did not present either sufficient direct or indirect evidence to create a genuine issue of material fact on the issue of discrimination.

### 1. Direct evidence

Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." Sniecinski,666

N.W.2d at 192 (quoting Hazle v. Ford Motor Co., 628 N.W.2d 515 (2001)) (internal quotations omitted). It shows that the person who made the challenged decision, or was otherwise meaningfully involved in that decision, had a bias or that bias affected the challenged decision. Nemet v. First Nat'l Bank of Ohio, No. 98-4076, 1999 WL 1111584, *4 (6th Cir. Nov. 22, 1999). "Racial slurs by a decision maker constitute direct evidence of racial discrimination that is sufficient to get the plaintiff's case to a jury." Downey v. Charlevoix County Bd. of County Rd. Comm'rs, 576 N.W.2d 712, 718 (Mich. Ct. App. 1998) (citing Harrison v. Olde Fin. Corp., 572 N.W.2d 679, 683 (Mich. Ct. App. 1997)). Here, Marshalek's comment regarding "brown people" and other comments by Patrick, Wegert, and Kevin G. potentially constitute direct evidence of racial discrimination provided that (1) they were made by a decision maker and (2) the decision to terminate Hussain was based on a predisposition to discriminate on the basis of religion or national origin.

The first issue to be determined is whether any of the individuals who allegedly made racial comments are decision makers. Comments made by individuals not involved in the decision-making process do not constitute direct evidence of discrimination. Carter v. Univ. of Toledo, 349 F.3d 269, 273 (6th Cir. 2003). A supervisor is a decision maker, however, even if a higher level manager must approve her request or recommendation that an employee be terminated. See DiCarlo v. Potter, 358 F.3d 408, 417 (6th Cir. 2004). In DiCarlo, the supervisor submitted a memorandum to his manager "requesting [the employee's] removal for failure to meet satisfactory performance levels." Id. at 413. Because the manager agreed with the

9

assessment, he approved the termination. <u>Id.</u> This Court held that the supervisor was "clearly . . . an individual with decision making authority" because the decision to terminate the employee was made on the supervisor's recommendation by a manager who agreed with the supervisor's assessment. <u>Id.</u> at 417.

Here, Marshalek recommended to Barick that Hussain be terminated and then awaited the approval of Barick and the Khimjis. Like the supervisor in <u>DiCarlo</u>, Marshalek recommended to those with authority that the employee be terminated and awaited their approval. Thus, as the supervisor in <u>DiCarlo</u> was a decision maker, so too was Marshalek a decision maker. Other than Marshalek, however, none of the individuals who allegedly made discriminatory comments regarding Hussain were involved in the decision to terminate him. Thus, only Marshalek was a decision maker.

Having determined that Marshalek was a decision maker, the next issue is whether Marshalek terminated Hussain because of her predisposition to discriminate on the basis of national origin. <u>DiCarlo</u>, 358 F.3d at 416. Statements made by an immediate supervisor and decision maker, that specifically and derogatorily reference an employee's national origin and that are in a close temporal proximity to the termination decision, present sufficient evidence of causation. <u>Id.</u> at 417. Conversely, a weaker temporal proximity requires a greater quantum of evidence than in cases with a tighter time line of events. <u>See</u> <u>id.</u> (distinguishing <u>Hein v. All Am. Plywood, Co.</u>, 232 F.3d 482 (6th Cir. 2000)).

In <u>DiCarlo</u>, the supervisor uttered the derogatory remarks only three weeks prior to the employee's termination. <u>Id.</u> This Court held that such a strong temporal proximity was sufficient evidence of causation to withstand summary judgment. <u>Id.</u> In doing so, this Court distinguished <u>Hein</u>, emphasizing that the derogatory remarks there were made more than five months before the employee's termination and, therefore, greater proof of causation was necessary. <u>Id.</u> (distinguishing <u>Hein</u>, 232 F.3d at 489).

Here, Marshalek uttered her derogatory comment about "brown people" at Highgate's Dallas seminar around September 25, 2001. Hussain, however, was not terminated until April 22, 2002, nearly seven months after Marshalek's remark. This interim time is even greater than the five months in <u>Hein</u> which rendered the temporal proximity insufficient to establish causation. Thus, the temporal proximity here, likewise, is not sufficient to establish causation without some further proof. Hussain, however, presents no other evidence of causation. Therefore, we conclude that he has not presented sufficient evidence of causation to survive summary judgment on the basis of his direct evidence.

## 2. Indirect or circumstantial evidence

The Court now looks to whether Hussain has provided sufficient indirect or circumstantial evidence of discrimination to withstand summary judgment. To prove an allegation of discrimination utilizing indirect or circumstantial evidence, a plaintiff must proceed under the evidentiary framework promulgated in <u>McDonnell Douglas v. Green</u>, 411 U.S. 792

(1973). <u>Sniecinski</u>, 666 N.W.2d at 193.  To establish discrimination under the <u>McDonnell</u> <u>Douglas</u> framework, the plaintiff must first establish a prima facie case of discrimination. 411 U.S. at 802. The burden then shifts to the defendant to provide a legitimate nondiscriminatory reason for the adverse employment action. <u>Id.</u>  Once the defendant has met this burden, the plaintiff is then afforded the opportunity to prove that the defendant's stated reason is a pretext for unlawful discrimination. <u>Id.</u> at 804.

a. <u>Prima facie case</u>

To establish a prima facie case of discrimination under ELCRA, a plaintiff must prove four things: "(1) [he] belonged to a protected class, (2) [he] suffered an adverse employment action, (3) [he] was qualified for the position, and (4) [the adverse employment action] occurred under circumstances giving rise to an inference of unlawful discrimination." <u>Sniecinski</u>, 666 N.W. 2d at 193 (citing <u>Hazle</u>, 628 N.W.2d 515; <u>Lytle v. Malady</u>, 579 N.W. 2d 906, 916 (Mich. 1998)); <u>see also</u> <u>Town v. Mich. Bell. Tel. Co.</u>, 568 N.W.2d 64, 68 (Mich. 1997).  Here, it is not disputed that Hussain is a member of two protected classes or that he suffered an adverse employment action.  The parties dispute, however, whether Hussain was qualified for the position and whether his termination occurred under circumstances giving rise to an inference of unlawful discrimination.

It is a question of fact whether Hussain was qualified for the position. "An employee is qualified if he was performing his job at a level that met the employer's legitimate expectations."

Town, 568 N.W.2d at 69. "A court must evaluate whether a plaintiff established his qualifications independent of the employer's proffered non-discriminatory reasons for discharge." Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 585 (6th Cir. 2002). This Court, applying Michigan law, has held that an employee's receipt of performance bonuses created at least a question of fact that the employee was meeting his employer's legitimate expectations. Id. at 586-587; see also Mukerhee v. ABN Amro N. Am., No. 2469009, 2004 WL 1057819, *3-4 (Mich. Ct. App. May 11, 2004) (applying Cicero).

Here, Highgate awarded Hussain a performance bonus at the end of 2001. Moreover, it offered him the position of general manager of the Detroit Best Western, which was considered a promotion. An employer generally would not award an employee a performance bonus or offer him a promotion unless that employee was satisfying the employer's performance expectations. Thus, without considering statements made by Highgate as its proffer for a legitimate reason for Hussain's termination, it is a question of fact whether Hussain was meeting Highgate's legitimate business expectations.

The Court next must consider whether the circumstances of Hussain's termination give rise to an inference that he was discriminated against. Circumstances give rise to an inference of discrimination if the employee "was treated differently than persons of a different class for the same or similar conduct." Singal v. Gen'l Motors Corp., 447 N.W.2d 152, 156 (Mich. Ct. App. 1989); see also Quiros v. Kalitta Flying Service, Inc., No. 229229, 2003 WL 21279591, *6 (Mich. Ct. App. June 3, 2003) (per curiam). In other words, the plaintiff must show that "he was

treated less favorably than a similarly situated individual outside his protected class." Howard v. Family Indep. Agency, No. 243973, 2004 WL 243375, *4 (Mich. Ct. App. Feb. 10, 2004) (per curiam). "Employees are similarly situated if all of the relevant aspects of their employment situations are nearly identical." Howard, 2004 WL 243375 at *4 (citing Town, 568 N.W.2d at 70.)

Here, Hussain claims that he was treated differently from the similarly situated Sikka because Sikka was excused from the training seminar in Dallas. Both Hussain and Sikka requested to be excused from traveling to Dallas for the seminar, citing safety concerns, but Marshalek excused only Sikka.[2] Hussain does not dispute that he was having performance problems regarding the timeliness and accuracy of his bank reconciliations prior to the Dallas seminar and the conversion to Dynamics. He, however, presents no evidence that Sikka was experiencing any difficulties with his bank reconciliations. Hussain and Sikka, therefore, were not similarly situated because only Hussain was having performance problems with his bank reconciliations.

Hussain also argues that the circumstances give rise to an inference of discrimination because no other controller was audited or placed on a PIP. He, however, presents no evidence that any of other controllers were having problems completing their reconciliations. Thus,

---

[2]Although Sikka brought his request directly to Marshalek and Hussain brought his request through the chain of command, this distinction does not defeat Hussain's claim that they are similarly situated. The manner in which one requested to be excused is not a relevant aspect of employment if the same individual, Marshalek, is making the decision.

14

Hussain was not similarly situated with any of the other controllers. Highgate's auditing Hussain and placing him on a PIP, therefore, do not give rise to an inference of discrimination.

Alternatively, a plaintiff can demonstrate that the circumstances give rise to an inference of discrimination if "the person who terminated him was predisposed to discriminate against persons in the affected class and had actually acted on that disposition in discharging him." Singal v. Gen'l Motors Corp., 447 N.W.2d 152, 156 (Mich. Ct. App. 1989), see also Harrison, 572 N.W.2d at 682 n.6. Hussain argues that Marshalek's statement that there are too many "brown people" in the country indicates her predetermination to discriminate against Pakistanis. As discussed above, however, Hussain has presented no evidence indicating a causal connection between this statement and the decision to terminate him. Thus, while it may be a question of fact whether Marshalek was predisposed to discriminate against Hussain, there is no evidence that she actually acted on that disposition in discharging him. Marshalek's statement, therefore, does not give rise to an inference of discrimination.

Lastly, Hussain argues that there is an inference of discrimination because he was replaced with an individual not shown to be a member of his protected classes. One cannot establish a prima facie case of discrimination, however, "merely by providing evidence that a qualified minority candidate was rejected in favor of a qualified nonminority candidate." Hazle, 628 N.W.2d at 525. Thus, the mere fact that Hussain was replaced with someone outside his protected classes is insufficient to establish an inference of discrimination. Consequently, Hussain has failed to establish that the circumstances surrounding his termination give rise to an

15

inference of discrimination. He, therefore, has failed to establish a prima facie case of discrimination.

### b. Legitimate non-discriminatory reason and pretext

Assuming, *arguendo*, that Hussain had established a prima facie case of discrimination, his claim would still fail because Highgate provides a legitimate non-discriminatory reason for terminating Hussain, which he does not show was mere pretext for discrimination. Poor performance is a legitimate non-discriminatory reason for termination. See Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 588 (6th Cir. 2002). Highgate argues that Hussain was not meeting performance expectations, specifically that he was not timely completing bank reconciliations. Highgate placed Hussain on a personal improvement plan, and claims that it terminated him when he did not fulfill his obligations under the PIP. Such non-performance is a sufficient non-discriminatory reason for termination to shift the burden back to Hussain.

An employee has three ways by which to prove the existence of pretext: "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate his discharge, or (3) that they were *insufficient* to motivate discharge." Manzer v. Diamond Shamrock Chem. Co., 29 F.3d 1078, 1084 (6th Cir. 1994) (quoting McNabola v. Chicago Transit Auth., 10 F.3d 501, 513 (7th Cir. 1993)); see also Dubey v. Stroh Brewery Co., 462 N.W.2d 758, 760 (Mich. Ct. App. 1990).

The first type of showing is easily recognizable and consists of evidence that the

> proffered bases for the plaintiff's discharge never happened, *i.e.,* that they are "factually false." The third showing is also easily recognizable and, ordinarily, consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff. . . .

> The second showing, however, is of an entirely different ilk. There, the plaintiff admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal. The plaintiff's attack on the credibility of the proffered explanation is, instead, an indirect one. In such cases, the plaintiff attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the employer's explanation is a pretext, or coverup.

Manzer, 29 F.3d at 1084 (internal quotations and citations omitted).

"A reason cannot be proved to be 'a pretext for discrimination' unless it is shown both that the reason was false *and* that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993). A factfinder, however, *may* infer discrimination from the falsity of the employer's explanation. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000) (explaining St. Mary's Honor Ctr., 509 U.S. 502). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." Id. (citing St. Mary's Honor Ctr., 509 U.S. at 517). Such a showing, however, does not require the inference of discrimination. Id. at 148. "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's

17

explanation, no rational factfinder could conclude that the action was discriminatory." Id.  Thus, if the record revealed some other non-discriminatory reason for discharge, the employer would remain entitled to summary judgment.  Id.

Here, Hussain argues that he could not have been legitimately terminated for failing to complete bank reconciliations by March 31, 2002 because he had until April 30, 2002 to complete the PIP.  Although it permitted Hussain until April 30, 2002 to complete payroll and travel agent reconciliations, Marshalek's memo setting forth the conditions of the PIP specifically provided that "[a]ll bank recs (except Payroll and TA [travel agent]) are to be completed through the end of February by March 31st.  This includes reconciliations that are to be completed in Dynamics." (J.A. at 308.)  Hussain does not allege that he was granted an extension to achieve compliance.  Rather he argues that he had until April 30, 2002 to complete the reconciliation because the March 31, 2002 deadline was not a drop dead deadline.  Hussain, however, points to no evidence supporting this conclusion.  No reasonable factfinder, therefore, could conclude that the deadline for Hussain to complete all bank reconciliations, other than payroll and travel agent reconciliations, was any date other than March 31, 2002.  He did not have the reconciliations completed by that date.  Consequently, Highgate's proffered reason for termination does have a basis in fact.

Hussain next references Barick's e-mail which, he contends, indicates that his handling of travel agent commissions was the real reason for his termination.  In an e-mail responding to Marshalek's complaints regarding Hussain's handling of travel agent commissions, Barick stated

that Hussain "has to go." While the e-mail suggests that Hussain's failure to timely complete the PIP did not actually motivate his discharge, it also presents an alternative legitimate reason for discharge, his handling of travel agent commissions. Thus, the e-mail does not establish that Hussain's failure to complete the PIP was a pretext for discrimination.

Hussain also points out that Barick had posted his position as vacant in January 2002, and it remained posted despite Hussain's complaints. Barick, however, posted the position because Hussain indicated that he might resign and because Barick was aware of Hussain's performance problems. Furthermore, Marshalek informed applicants for the position that it was not actually vacant but may become vacant in the future. She did not hire a replacement until after Hussain had failed to complete the PIP. Moreover, Highgate did not terminate Hussain until April, after he failed to timely complete the PIP and three months after the position was initially posted. Based on this evidence, no rational factfinder could conclude from Barick's posting of the position that the decision to terminate Hussain was not motivated by his failure to complete the PIP.

Lastly, Hussain asserts that Marshalek's failure to excuse him from the Dallas seminar provides evidence of pretext and that pretext is evident because no other controller was placed on a PIP or audited. As discussed above however, he does not present any evidence of other controllers who were having problems completing their bank reconciliations. Thus, Hussain has not presented evidence that a similarly situated employee was treated differently. Hussain, therefore, has not established that Highgate's proffered reason was insufficient to motivate his

19

discharge and has not established any question of fact regarding the issue of pretext.

### B. <u>Hostile work environment</u>

Hussain also alleges that he was subject to a hostile work environment.  To establish a hostile work environment  under ELCRA, a plaintiff must show five things: (1) the employee belonged to a protected group; (2) the employee was subjected to communication or conduct on the basis of his protected status; (3) such conduct or communication was unwelcome; (4) the unwelcome conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and (5) respondeat superior.  <u>See</u> <u>Chambers v. Trettco, Inc.</u>, 614 N.W.2d 910, 915 (Mich. 2000). At issue here is whether the unwelcome conduct created an intimidating, hostile, or offensive work environment and whether Highgate is liable under respondeat superior.

### 1. <u>Intimidating, hostile, or offensive work environment</u>

The first issue is whether Hussain can establish that the derogatory comments created an intimidating, hostile, or offensive work environment.  "[W]hether a hostile work environment existed shall be determined by whether a reasonable person, in the totality of the circumstances, would have perceived the conduct at issue as substantially interfering with the plaintiff's employment or having the purpose or effect of creating an intimidating, hostile, or offensive environment."  <u>Radtke v. Everett</u>, 501 N.W.2d 155, 167 (Mich. 1993). A single incident of harassment is generally not sufficient to create a hostile work environment. <u>Id.</u> at 168.  Rather, a

court should look at all of the circumstances "including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 270-271 (2001) (internal quotations omitted) (quoting <u>Faragher v. Boca Raton</u>, 524 U.S. 775, 787-788 (1998)). "Simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not rise to that level. <u>Faragher</u>, 524 U.S. at 788, <u>quoted in</u> <u>Clark County Sch. Dist.</u>, 532 U.S. at 271.

Hussain claims that Marshalek stated that "there were too many immigrants in the country, too many brown people" at the meeting in Dallas. He also alleges, while watching news coverage there, Patrick said he did not understand why the United States did not just drop an atomic bomb on Afghanistan. Neither Dallas comment was directed at Hussain or was physically threatening. While Patrick's comment regarding dropping an atomic bomb on Afghanistan could indicate much more of a physical threat, it fails to do so for two reasons. First, Hussain is Pakistani, not Afghani. Second, and more importantly, because of surrounding world events, a reasonable person would not view such a statement as a remark directed as a threat against his or her person, but rather a statement of a political/military opinion. There is no evidence that these comments were anything more than offhand comments and isolated remarks. A reasonable person, therefore, could not conclude that the these comments created a hostile work environment.

It is, however, a question of fact whether a reasonable person would view the Detroit

21

comments as creating a hostile work environment. Kevin G. told Hussain that he should dress as

Osama bin Laden for Halloween. Additionally, Hussain states in his first affidavit that Wegert

and other staff repeatedly called him Taliban and, in the second, says it was on a near daily

basis.[3] Just as world events diminished the harassing nature of Patrick's comment, here they

increase the severity of these comments. Furthermore, the "Taliban" comments were made

either repeatedly or on a near daily basis. This frequency would allow a reasonable person to

conclude that the comments were intended to or did create a hostile work environment.

Moreover, Hussain claims that he complained to Wegert about calling him Taliban, but he did

not stop. Thus, there is at least a question of fact whether a reasonable person would conclude

that Wegert's comments were intended to create a hostile work environment.

## 2. Respondeat superior

The next issue that must be determined is whether Highgate is subject to respondeat

superior liability. For an employer to be liable on an employee's hostile environment claim, the

employee must show "that the employer failed to take prompt and adequate remedial action upon

notice of the creation of a hostile work environment." Chambers, 614 N.W.2d at 916. Here,

---

[3]Highgate argues that this Court should not consider these affidavits because they contradict Hussain's deposition testimony. Highgate cites to Hussain's deposition testimony that: "Paul Wegert himself made a comment as he will pass by my office or come into my office and he will call me Taliban." (J.A. 280.) Highgate contends that this testimony reflects that only one incident occurred. However, that is not a required interpretation of this statement and it could be interpreted as describing a typical incident. Furthermore, the District Court did not find that these affidavits were contradictory.

Highgate argues that Hussain did not provide it adequate notice of the hostile environment. Notice of the hostile environment "is adequate if, by an objective standard, the totality of the circumstances were such that a reasonable employer would have been aware of a substantial probability that . . . harassment was occurring." Id. at 919. Furthermore, an employer is not strictly vicariously liable merely because a supervisor created the hostile environment. Id. at 916.[4] The employer must still have notice of the alleged harassment. Radtke, 501 N.W.2d at 169. This notice "can be shown by evidence that a complaint was made to a higher management or that the employer should have known about the harassment because of its pervasiveness." Jager v. Nationwide Truck Brokers, Inc., 652 N.W.2d 503, 510 (Mich. Ct. App. 2001) (citing Sheridan v. Forest Hills Public Schools 637 N.W.2d 536 (Mich. Ct. App. 2001); Hartleip v. McNeilab, Inc., 83 F.3d 767, 776-777 (6th Cir., 1996)) "The bottom line is that, in cases involving a hostile work environment claim, a plaintiff must show some *fault* on the part of the employer." Chambers, 614 N.W.2d at 916.

Hussain argues that notice can be imputed to Highgate because Wegert is a general manager and Marshalek was his supervisor. Hussain does not provide evidence that he complained to anyone other than Wegert regarding Wegert's conduct. In Jager, the court noted that complaining only to the harasser is insufficient to constitute notice because it "ensures that higher management in the company will not learn of the harassment." 652 N.W.2d at 511. Thus Hussian's complaints to Wegert cannot constitute notice of the harassment.

---

[4]In this respect, Michigan law differs from federal law.

Hussain contends that Diane Tunstall, a human resources employee, heard Wegert on one occasion, and that this should be sufficient to constitute notice. Hussain, however, presents no evidence that Tunstall was aware that he was offended by the comment. Indeed, Tunstall states that she thought they were just joking around. This incident, therefore, cannot constitute notice because Hussain failed to make known that the comment offended him. Additionally, Hussain contends that knowledge should be imputed to Highgate because Marshalek participated in the harassment by virtue of her "brown people" comment. Hussain, however, did not bring this comment to anyone's attention.

Hussain presents no further evidence that Highgate was on notice of the hostile environment. He does not argue that the environment was so pervasively hostile as to constitute notice to the employer. Thus, Hussain has not presented any evidence that the employer was at fault for failing to correct Wegert and the other staff's comments. Hussain, therefore, cannot establish respondeat superior liability. Accordingly, summary judgment in favor of Highgate on the hostile environment claim was proper.

**IV**

For the foregoing reasons, the judgment of the District Court granting summary judgment is affirmed.