NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0667n.06
Filed: August 5, 2005

No. 04-1435

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

ERICA VREDEVELT,

    Plaintiff-Appellant,

v.

THE GEO GROUP, INC., f/k/a
WACKENHUT CORRECTIONS
CORP.,

    Defendant-Appellee.

_____/

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN

**OPINION**

**Before: CLAY and SUTTON, Circuit Judges; REEVES, District Judge.**[*]

    **DANNY C. REEVES, District Judge.** Plaintiff-Appellant Erica Vredevelt appeals the decision of the district court granting summary judgment to Defendant-Appellee The GEO Group, Inc. on her gender discrimination and sexual harassment claims pursuant to Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq*., and intentional infliction of emotional distress claim under Michigan common law. For the reasons that follow, we affirm the district court's judgment.

**BACKGROUND**

---

[*] The Honorable Danny C. Reeves, United States District Judge for the Eastern District of Kentucky, sitting by designation.

The GEO Group, Inc., formerly known as Wackenhut Corrections Corp. ("GEO"), operates the Michigan Youth Correctional Facility (the "Facility") in Baldwin, Michigan, under a contract with the Michigan Department of Corrections. The Facility is a maximum security youth detention prison housing inmates ranging in age from 13 to 16 years. GEO hired Vredevelt as a Corrections Officer ("CO") out of its first training academy in 1999. She worked at the Facility until April 2002 when she left to take a new job. Shortly after beginning her employment, Vredevelt became a member of the Facility's Corrections Emergency Response Team ("CERT") – a small unit of COs that responds to critical incidents at the Facility involving inmates.

As a CERT team member, Vredevelt received additional compensation of $20 to $30 per month. At the Facility, COs are required to work at various posts, including the Medical Department, Visitation, Recreation, ARV (emergency response vehicle), Control Center, Housing Pods (inmate residence areas), Utility (a rotating post that helps where needed), Tower (gun towers surrounding the Facility's perimeter), Checkpoint, and Segregation (a housing unit reserved for violent and disruptive inmates). GEO has the authority to assign a CO to any post. Specifically, the Collective Bargaining Agreement between GEO and the CO's Union provides that "the direction of the working force . . . shall be vested exclusively with the employer." It further provides that GEO "shall have the right . . . to determine work schedules and type of work."

For the first six months of her employment, Vredevelt worked in Segregation. Following that assignment, she worked Utility for over a year. She also worked without objection or

incident in the Medical Department, Recreation, the Towers and the Housing Pods as those duties were assigned to her.

As a CERT member, Vredevelt was required to respond quickly to critical incidents involving inmates. GEO stored all of the CERT equipment in a locker room adjacent to the men's bathroom. Upon notification of an incident, team members would gather their gear (leg pads, elbow pads, a helmet, gas mask and shoulder pads) from the locker room and change clothing and equipment prior to addressing the incident. GEO contends that, as a matter of personal preference, Vredevelt would change her clothing and equipment in the men's locker room rather than carry the equipment to the women's restroom located approximately 20 to 30 feet away. Vredevelt claims that, because the equipment was too heavy and because it was difficult to maneuver past the men, she was forced to change in the men's locker room so that she could respond to emergencies in a timely manner.

In 2001, Vredevelt applied for a promotion to sergeant. In applying for this position, she was required to submit a letter of interest and participate in a Promotion Board interview. Vredevelt was also required to deliver an oral presentation and complete a written exercise. Although Vredevelt was not selected, she acknowledges that the person who received the position, Thomas DeWolf, was a qualified candidate.

At the end of 2001, Vredevelt took a second job outside the Facility. However, she was permitted by the Warden to work three days a week at the Facility to accommodate her work schedule.[1] Subsequently, in February or March 2002, Vredevelt was removed from the CERT

---

[1]    Vredevelt still worked forty hours a week at the Facility but did so over a three-day period.

team by Deputy Warden Daniel Bosse. According to Bosse, Vredevelt was removed from the team because she could only work three days a week and GEO could not afford to have one of its limited number of CERT members unavailable on other work days. Vredevelt never sought reversal of this decision from Warden Frank Elo. Instead, approximately one week after her removal from the CERT team, she left her job at the Facility and started working as a full-time deputy with the Ottawa County Sheriff's Department. Vredevelt testified that she made more money at this job than she did at the Facility.

Before resigning, Vredevelt wrote to GEO to announce her intentions and reasoning:

> This is a letter regarding my resignation from Wackenhut Corporation/Michigan Juvenile Prison. I Erica R. Vredevelt will be leaving WCC after 2 weeks of service to further my career elsewhere. I am grateful and thankful of the time and effort Wackenhut has given me, my thanks goes to all those officers above and below me in rank who have taken time to train and educate me in the field of corrections. The knowledge and skills I have learned here will help me in [my] future career.

> I leave WCC with a great respect for the staff and corrections officers. They put forth a good effort in teamwork and keeping company standards and mission statements. There is no reason I would not come back to work for WCC in the future. Once again I thank all those who helped me become the corrections officer I am today.

On October 1, 2003, Vredevelt and nine other plaintiffs filed a Joint Amended Complaint against GEO alleging gender discrimination, sexual harassment and retaliation claims under Michigan's Elliott-Larsen Civil Rights Act, M.C.L. § 37.2101 *et seq.* ("MCRA"). In addition, the group asserted claims for defamation, false imprisonment and intentional infliction of emotional distress under Michigan common law. In her Joint Amended Complaint, Vredevelt asserted five claims against the Defendant: (1) disparate treatment gender discrimination (Count

-4-

1); (2) hostile work environment (Count II); (3) retaliation (Count III); (4) intentional infliction of emotional distress (Count IV); and (5) false imprisonment (Count V). Subsequently, Vredevelt abandoned her false imprisonment and retaliation claims. Two of the ten plaintiffs voluntarily dismissed their claims and six of the ten settled their claims for nominal amounts. The district court dismissed the claims of the remaining two plaintiffs (including Vredevelt) on summary judgment. That dismissal is the subject of the present appeal.

Vredevelt's gender discrimination claim is based on the contention that she and other women were never assigned to the best post positions and that she was improperly removed from the CERT team. She also contends that she was passed over for the sergeant job despite being more qualified than the male CO who received the promotion. In addition, Vredevelt claims that she and the other female CERT members were not provided with a separate changing facility and, therefore, were forced to change in front of male CERT officers.

In support of her sexual harassment claim, Vredevelt alleged that GEO employees – primarily Deputy Warden Bosse – made comments that were offensive. These comments included:

1. Bosse allegedly told Vredevelt that she should be home "barefoot and pregnant."

2. Bosse allegedly told Vredevelt that she was incapable of performing utility or transport after she went part time.

3. Someone told Vredevelt that Bosse said that he would never promote a female.

4. New corrections officers allegedly made comments to Vredevelt such as "who do you think you are?" or "your s - - - does not stink" in reference to the fact that she wore fatigues instead of a uniform.

5.      Bosse made a comment that Vredevelt "was a female and [she] couldn't handle [herself] around inmates."

6.      Officer Griffin allegedly made a comment to Vredevelt about her "camel toe" when she wore her fatigues.

7.      Vredevelt's fellow CERT members allegedly made bets about the color of her underwear and asked to see her tattoos.

8.      A fellow corrections officer made comments to the effect of "let's go for a quick f - - k" and "give me a b - - w job."

9.      After a male officer commented that she was not performing "pat downs" properly, Vredevelt states that she was required to pat down the complaining officer.

Vredevelt alleges that these comments support her sexual harassment and hostile work environment claims. In addition, Vredevelt has asserted a claim of intentional infliction of emotional distress.

## STANDARD OF REVIEW

A district court's grant of summary judgment is reviewed *de novo*. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering such a motion, the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

## DISCUSSION

## I. Disparate Treatment

Section 202 of the MCRA prohibits an employer from discriminating "against an individual with respect to employment . . . because of religion, race, color, national origin, age, sex, height, weight, or marital status." M.C.L. § 37.2202(1)(a). Courts have recognized two broad categories of claims under this section: disparate treatment and disparate impact claims. *See Dep't of Civil Rights ex rel. Peterson v. Brighton Area Schools*, 431 N.W.2d 65 (Mich. Ct. App. 1988) (citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335-36 n. 15 (1977). In this case, Vredevelt has alleged a disparate treatment gender discrimination claim.

Disparate treatment claims may be established under ordinary principles of proof by the use of indirect or direct evidence. *Town v. Michigan Bell Tel. Co.*, 568 N.W.2d 64 (Mich. 1997). When a plaintiff uses indirect evidence, she must establish a "rebuttable prima facie case on the basis of proofs from which a factfinder could infer that [she] was the victim of unlawful discrimination." *Sniecinski v. Blue Cross and Blue Shield of Mich.*, 666 N.W.2d 186, 193 (Mich. 2003); *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[2] Under this test, as applied by the state of Michigan, a plaintiff may establish a prima facie case of prohibited discrimination by demonstrating that: (1) she was a member of a protected class; (2) adverse employment action was taken against her; (3) she was qualified for the position; and (4) she was treated

---

[2]    In examining discrimination claims under Michigan's Civil Rights Act, Michigan courts have adopted the analysis used in evaluating discrimination claims brought under Title VII of the Civil Rights Act of 1964 ("Title VII"). *See Sniecinski,* 666 N.W.2d at 193 (for purposes of Michigan's Civil Rights Act, the elements of a prima facie case of unlawful employment discrimination under the *McDonnell Douglas* approach should be tailored to the facts and circumstances of each case); *Sharp v. City of Lansing*, 606 N.W.2d 424 (Mich. Ct. App. 1999) (an employer is liable under the Michigan Civil Rights Act whenever it would be liable under Title VII); *Jackson v. Quanex Corp.*, 191 F.3d 647 (6th Cir. 1999); *Alexander v. Local 496, Laborers' Int'l Union of N. Am.*, 177 F.3d 394, 418 (6th Cir. 1999).

differently than similarly-situated male employees. *Town*, 568 N.W.2d at 68. If a prima facie case is established, the employer has the burden of coming forward with a legitimate, nondiscriminatory reason for the adverse employment action. If the employer offers such evidence, the plaintiff has the burden of proving that the stated reason is merely a pretext for discrimination. This burden merges with the plaintiff's overall burden of proving the claim. *Id.*

A plaintiff alleging discrimination *via* direct evidence is not subject to the *McDonnell Douglas* burden-shifting framework, *Harrison v. Olde Fin. Corp.*, 572 N.W.2d 679, 683 (Mich. Ct. App. 1997), though she still must establish that she suffered an adverse employment action in order to state a claim, *see Sniecinski*, 666 N.W.2d at 193. "Direct evidence is evidence which, if believed, would prove the existence of a fact (i.e. unlawful discrimination) without any inferences or presumptions." *Herendeen v. Mich. St. Police*, 39 F. Supp. 2d 899, (W.D. Mich. 1999); *see also Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (direct evidence of discrimination "does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by" discriminatory animus).

Vredevelt contends that she suffered discrimination at her employment because she is female. Thus, the initial issue in dispute, under either an indirect or a direct evidence approach, is whether she suffered an adverse employment action because of her sex. An "adverse employment action" for purposes of proving unlawful discrimination must be materially adverse in that it is more than a "mere inconvenience or an alteration of job responsibilities," and "must have an objective basis for demonstrating that the change is adverse, rather than the mere subjective impressions of the plaintiff." *Meyer v. City of Center Line*, 619 N.W.2d 182, 188

(Mich. Ct. App. 2002) (citing *Wilcoxon v. Minnesota Mining & Mfg. Co.*, 597 N.W.2d 250, 258 (Mich. Ct. App. 1999)). According to the Michigan courts, a "materially adverse" employment action includes: termination of employment; demotion evidenced by a decrease in wage or salary; a less distinguished title; a material loss of benefits; significantly diminished material responsibilities; or other indices that might be unique to a particular situation. *Wilcoxon*, 597 N.W.2d at 258.

Here, Vredevelt contends that she met this burden because she: (1) received poor post assignments; (2) was removed from the CERT team; (3) was not provided with comparable facility in which to change into her CERT gear; (4) failed to receive a promotion to sergeant; and (5) was constructively discharged. Vredevelt contends that the actions by GEO were based on her gender. Thus, she alleges that the district court erred in granting summary judgment on this claim.

A.     The Post Assignments

Vredevelt alleges that she and the other female employees working at the Facility were never assigned to the best post assignments. During her deposition, however, Vredevelt admitted that the desirability of the post positions was subjective. Specifically, she indicated that she particularly liked to work segregation but others did not because "it was the toughest to work." Further, although Vredevelt claimed that the pod position was undesirable, one of her former co-plaintiffs testified that she like working "a couple of the pods."

Vredevelt failed to demonstrate that her assignment to work certain post positions constituted an adverse employment action. As noted in *Wilcoxon*, in order for an employment

action to be adverse for purposes of a discrimination claim, "a plaintiff's subjective impressions as to the desirability of one position over another [are] not controlling." *Wilcoxon*, 597 N.W.2d at 258 (citing *Kocsis v Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996)). The Collective Bargaining Agreement between GEO and the CO's Union provides that GEO "shall have the right . . . to determine work schedules and type of work . . ." Moreover, as a CO, GEO could assign Vredevelt to any post. Certainly, GEO was not required to accommodate the post preferences of its employees. Thus, GEO's assignment of Vredevelt to one post position instead of another cannot be deemed an adverse employment action.

B.    Removal From The CERT Team

Vredevelt also contends that she suffered an adverse employment action when she was removed from the CERT team. As a CERT team member, Vredevelt was on a special unit of COs that was required to respond to critical situations involving inmates at the Facility. Vredevelt notes that when she was removed from the CERT team, she lost a monthly stipend of $20 to $30 per month. Moreover, Vredevelt claims that the CERT team members were considered the "cream of the crop" within the Facility. Therefore, according to Vredevelt, the alteration in pay – in addition to the fact that she was removed from a prestigious position – constituted an adverse employment action by GEO.

Even if all of this amounted to an adverse employment action, a point we need not decide, Vredevelt's gender-discrimination claim on this score comes up short. To the extent she means to establish indirect evidence of discrimination in connection with this claim, she has not proved one of the elements of a prima facie case – that she was treated differently from a similarly

situated male employee. Not only has she failed to show that the defendant offered anyone else (male or female) a comparable *benefit* – the opportunity to maintain a full-time, full-benefits, forty-hours-per-week schedule – she also has failed to show that a male employee was spared the alleged *hardship* she faced. In other words, she has not identified a single CERT member who was allowed to remain in the unit while working at the prison just three days a week.

To the extent Vredevelt means to show direct evidence of discrimination in connection with this claim and in connection with Bosse's statements about the job, she faces other shortcomings. For one, she was a member of the team shortly after commencing work with GEO in 1999 and she has acknowledged that Bosse never had a problem with her working on the CERT team until after she adopted her three-day-a-week work schedule. For another, the allegedly discriminatory statement made in connection with her removal from the CERT team does not appear to be "direct evidence" of discrimination, which is to say a statement that requires no inference that the challenged action was substantially motivated by discriminatory animus. *Johnson*, 319 F.3d at 865 ("[D]irect evidence of discrimination does not require a factfinder to *draw any inferences* in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.") (emphasis added); *Sniecinski*, 666 N.W.2d at 193 (noting that a plaintiff must "present direct proof that the discriminatory animus was causally related to the adverse decision" and that direct evidence requires proof that "discriminatory animus was  .  .  .  a substantial or motivating factor in the decision"). As Vredevelt herself says in her affidavit, "When affiant questioned Deputy Warden Bosse why she was not being renewed for her CCW permit [concealed weapons permit], Bosse

-11-

replied that if she didn't like his authority, then she should be home barefoot and pregnant." J.A. 808. But these statements require us to draw the inference that the controversy surrounding her CCW permit was motivated by, and was in preparation for, her removal from the CERT team. Proving that there is a distinction between the two, Vredevelt says later in the same affidavit that Bosse denied her permission to work on the CERT team not because her CCW permit had expired but because "she was only a part-time employee." *Id.*

For still another reason, GEO has presented evidence – unrebutted by Vredevelt – showing that she would have been removed from the team regardless of any impermissible gender-based motive. *See Sniecinski*, 666 N.W.2d at 193 (rejecting a direct evidence claim as a matter of law because the plaintiff failed to establish a causal link between the animus and the adverse decision); *Hein v. All-American Plywood Co.*, 232 F.3d 482, 488-89 (6th Cir. 2000) (rejecting direct evidence claim that failed to establish both "that the plaintiff's employer was predisposed to discriminate [and] . . . that the employer acted on that predisposition"). Warden Elo testified that it was important for a CERT member to be available five days a week so that the Facility could maximize the number of CERT members available on each of the three daily shifts. And Vredevelt did not present any evidence to rebut GEO's proof that the dismissal from the team was based on this eminently non-discriminatory reason.

### C. Failure To Provide A Comparable CERT Facility

Vredevelt also alleges that she suffered an adverse employment action when GEO "forced" her to change into her CERT gear in the men's locker room. Specifically, Vredevelt contends that no separate changing facilities were provided to women CERT members. GEO,

however, presented evidence that there was a women's restroom near the locker room where the CERT gear was stored. In addition, GEO noted that there were stalls in the men's restroom where at least one other female CERT member changed clothes. Thus, as GEO contends, there were other options available to Vredevelt but she opted not to take advantage of these alternatives. In addressing this issue, the district court acknowledged that this situation was not ideal but determined that women CERT members, including Vredevelt, had other options and were not "forced to undress in front of the men." At most, Vredevelt would have been "inconvenienced" by having to gather her CERT gear, carry it to the women's restroom, and change in a different location from the male members of the CERT team. And as previously noted, a mere inconvenience does not constitute a materially adverse employment action. *Meyer*, 619 N.W.2d at 188.

D.    Failure To Receive Promotion To Sergeant

Vredevelt also argues that she suffered an adverse employment action when GEO selected a male CO for promotion to sergeant instead of her. A failure to promote may constitute an adverse employment action. *Allen v. Mich. Dept. of Corrections*, 165 F.3d 405 (6th Cir. 1999) (construing adverse employment action under Title VII). But even if she suffered an adverse employment action when she was not promoted, Vredevelt's claim nonetheless fails under either an indirect or direct evidence approach.

In the context of a failure-to-promote claim, a plaintiff seeking to use indirect evidence must demonstrate that: "(1) she belongs to a protected class, (2) she suffered an adverse employment action, (3) she was qualified for the position, and (4) the job was given to another

person under circumstances giving rise to an inference of unlawful discrimination." *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 523 (Mich. 2001). Although Vredevelt is able to satisfy the first two elements of this test, she cannot establish the remaining two elements by simply showing that she was qualified for the position and yet a male candidate was chosen. *See id.* at 525. Rather, she must present evidence that the employer's actions, "if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Id.* In short, an inference of unlawful discrimination does not arise, as a matter of law, merely because an employer has chosen between two qualified candidates. *Id.*

GEO offered several permissible explanations for promoting DeWolf over Vredevelt. Among them were DeWolf's military background (which it thought was well-suited to the correctional setting), the fact that he had been a CERT team leader, and the fact that he possessed "natural leadership ability." In contrast, GEO explained, Vredevelt lacked military experience, had only been a CERT team member and "lacked leadership." In addition, GEO noted that DeWolf scored higher than Vredevelt on the promotion board exam. According to GEO, DeWolf in the end was simply more qualified than Vredevelt.

In response, Vredevelt contends that she was the more qualified candidate for the sergeant's position. Specifically, she asserts that she had taken college criminal justice classes, while DeWolf had not, and that she had more seniority than DeWolf. Given GEO's recitation of DeWolf's qualifications, Vredevelt's allegation that she was more qualified for the position than DeWolf is unpersuasive. At best, the comparison in this case is between two qualified employees.

-14-

Even if Vredevelt's claims had sufficed to establish a prima facie case, she still could not prevail. Under the burden-shifting framework used in indirect evidence cases, GEO's legitimate, nondiscriminatory reasons for hiring DeWolf instead of Vredevelt shift the burden once again to Vredevelt, requiring her to produce evidence that would permit a reasonable jury to conclude that GEO's explanations are a pretext for gender discrimination. The district court, however, correctly concluded that she did not meet this burden. Other than her subjective claim that she was more qualified than DeWolf, she has failed to present evidence to support her claim that GEO's stated reasons for hiring DeWolf are a pretext. *See Hazle*, 628 N.W.2d at 521-22; *Town*, 568 N.W.2d at 72.

In *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), the Supreme Court held that, when the objective qualifications of a protected class member are equal to an employee who was not a member of the protected class, the employer has the discretion to choose among these employees, provided that the decision is not based on unlawful criteria. Even though a court may conclude that the employer misjudged the qualifications, that fact in and of itself does not expose the employer to liability. *Id.* at 259. In summary, Vredevelt's evidence merely raises a question about GEO's business judgment, but such questions are insufficient to overcome summary judgment.

Vredevelt's claims are likewise unsuccessful under a direct evidence theory of discrimination. As an initial matter, Vredevelt is less than clear in explaining which statements she means to use to establish direct evidence of discrimination. But even if we address each of the potential candidates for this theory, none of them presents "credible, direct evidence of

wrongful discrimination" with respect to her non-promotion claim. *See Hein*, 232 F.3d at 488. For instance, Bosse's "barefoot and pregnant" comment is not direct evidence of discrimination because it was neither made by a decisionmaker nor conceivably made in connection with the promotion decision. Most notably, the comment was made almost a year after DeWolf's promotion. *See Sniecinski*, 666 N.W.2d at 193 (noting that a plaintiff must "present direct proof that the discriminatory animus was causally related to the adverse decision"). Nor does Vredevelt's recollection of a comment by Officer Stuart Morin amount to direct evidence of discrimination. Vredevelt refers to this statement in her brief in the following way: "Officer Morin . . . recalled that a captain who *apparently* had input on the promotion decision or scoring stated that . . . ." Br. for App't at 9 (emphasis added). By its terms, this statement speculates about the decision-making capacity of this captain; it does not provide direct, credible evidence of discriminatory animus by a decisionmaker. Finally, Jill Sable's statements about the manner and tone of questioning in Vredevelt's interview are, at best, indirect evidence of animus. *Johnson*, 319 F.3d at 865 ("[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.").

That leaves the alleged statement by Bosse, overheard by Lt. McDaniel, repeated to Vredevelt and repeated once more in Vredevelt's affidavit, to the effect that Bosse would never promote a woman as long as he was a Deputy Warden. But, critically, this statement was not made by a decisionmaker. All agree, including Vredevelt, that Warden Elo made the decision to hire DeWolf, and no one has argued that Elo had any discriminatory animus either in general

-16-

or with respect to this decision. In suggesting that Bosse ought to be treated as a decisionmaker with respect to this decision, Vredevelt has done so in the most fainthearted of ways. In her opening brief on appeal, she argued (1) that Bosse was a "decisionmaker" with respect to the CERT team decision, not with respect to the promotion decision, App't Br. at 20 n. 11 and (2) that Bosse at most "influence[d] her non-promotion," *id*. at 18, a statement that would apply to anyone with any input in the decisionmaking process. While she attempts to make the necessary "decisionmaking" argument in her reply brief, she does so at a time when the point had already been waived and at any rate she does so without citing a single case in support of this less than self-evident proposition. But even if we were to address the issue in the interest of completeness, as the dissent does, the cases identified by the dissent do not establish that Bosse was a decisionmaker, much less the decisionmaker with respect to *this* decision. Bosse was one of three members of a committee tasked with interviewing the candidates; he did not tabulate the interview scores; and although he met with Warden Elo to discuss the scores, Vredevelt offers no evidence that Warden Elo adopted Bosse's assessment rather than forming his own conclusion (or even adopting another interviewer's assessment). The cited cases all are at least one step removed from this situation. *See DiCarlo v. Potter*, 358 F.3d 408, 413 (6th Cir. 2004) (holding that a supervisor's memo to the decisionmaker recommending discharge of an employee justified imputation of the supervisor's animus to the decisionmaker after the decisionmaker "agreed with the assessment and approved" the recommended discharge); *Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) (holding that a subordinate's animus could be imputed to the decisionmaker, but involving a situation where the two worked so

closely together that they acted jointly with respect to personnel decisions); *Hussain v. Highgate Hotels, Inc.*, 126 Fed. Appx. 256, 262 (6th Cir. 2005) (unpublished opinion) (holding that the animus of a single individual, not a committee, who made a recommendation to those in authority, then "awaited their approval," could be imputed to the decisionmaker).

### E. Constructive Discharge

Vredevelt also argues that she suffered an adverse employment action by being constructively discharged from her employment at the Facility. To establish a prima facie case of constructive discharge, an employee must present evidence that her employer deliberately made working conditions so intolerable that a reasonable person would feel compelled to quit the job. *Champion v. Nationwide Sec., Inc.*, 545 N.W.2d 596, 600 (Mich. 1996). In short, Vredevelt has not presented evidence to support this claim.

When Vredevelt took a second job, GEO accommodated her request to work part-time. However, when she realized that she would not receive full benefits, GEO again agreed to allow her to work forty hours over the course of three days. Certainly, these accommodations were a substantial benefit to Vredevelt and were beyond what GEO was required to do. Moreover, Vredevelt indicated in her resignation letter to the company that she "was grateful and thankful of the time and effort [GEO] ha[d] given [to her]." She further stated that "there [was] no reason [she] would not come back to work for WCC in the future." These concessions are contradictory to Vredevelt's claim that working conditions at the Facility were so intolerable that a reasonable person would *feel* compelled to quit. Rather, the evidence of record supports an opposite

-18-

conclusion: Vredevelt left to take a job for more money. Accordingly, Vredevelt did not present

sufficient evidence to support a constructive discharge claim.

## II.	Hostile Work Environment Claim

The MCRA prohibits an employer from discriminating because of sex, which includes

sexual harassment. M.C.L § 37.2202(1); M.C.L. § 37.2103 (I); *Chambers v. Trettco, Inc.*, 614

N.W.2d 910 (Mich. 2000). Specifically, M.C.L. § 37.2103(I) provides that:

> Discrimination because of sex includes sexual harassment. Sexual harassment
> means unwelcome sexual advances, requests for sexual favors, and other verbal
> or physical conduct or communication of a sexual nature under the following
> conditions:
>
> (i)	Submission to the conduct or communication is made a term or condition
> either explicitly or implicitly to obtain employment....
>
> (ii)	Submission to or rejection of the conduct or communication by an
> individual is used as a factor in decisions affecting the individual's
> employment....
>
> (iii)	The conduct or communication has the purpose or effect of substantially
> interfering with an individual's employment ... or creating an intimidating,
> hostile, or offensive employment ... environment.

Sexual harassment under one of the first two subsections is commonly referred to as quid

pro quo harassment. Sexual harassment under the third subsection is commonly labeled hostile

work environment harassment. *Chambers*, 614 N.W.2d at 915. To establish a claim of hostile

work environment harassment, an employee must prove the following by a preponderance of the

evidence:

> (1)	the employee belonged to a protected group;
> (2)	the employee was subjected to communication or conduct on the basis of
> sex;

-19-

(3)	the employee was subjected to unwelcome sexual conduct or communication;

(4)	the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the employee's employment or created an intimidating, hostile, or offensive work environment; and

(5)	respondeat superior

*Elezovic v. Ford Motor Co.*, 673 N.W.2d 776 (Mich. Ct. App. 2003). With regard to the respondeat superior element[3] of a claim of hostile work environment harassment, an employer may avoid liability "if it adequately investigated and took prompt and appropriate remedial action upon notice of the alleged hostile work environment." Prompt and appropriate remedial action will permit an employer to avoid liability if the plaintiff accuses either a co-worker or a supervisor of sexual harassment. An employer, of course, must have notice of the alleged harassment before being held liable for not implementing corrective action. *Chambers*, 614 N.W.2d at 916.

Thus, an employer may avoid liability for a claim of sexual harassment if it does not have actual or constructive notice of the alleged harassment. *Radtke v. Everett*, 501 N.W.2d 155 (Mich. 1993). The employee gives the employer actual notice if she complains about the harassment to higher management. *McCarthy v. State Farm Ins. Co.*, 428 N.W.2d 692, 695 (Mich. Ct. App. 1988). If the employee never complained to higher management, she can prove the employer had constructive notice "by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Id*. Notice is considered

---

[3]	The Supreme Court of Michigan has specifically held that the federal principles of vicarious liability related to sexual harassment claims brought under Title VII do not apply to claims brought under Michigan's Civil Rights Act. *See Chambers*, 614 N.W.2d 910. Therefore, with respect to this issue, the Title VII cases are inapplicable.

-20-

adequate if, under the totality of the circumstances and viewing the circumstances objectively, a reasonable employer would have known that there was a substantial probability that an employee was being sexually harassed. *Sheridan v. Forest Hills Pub. School*, 637 N.W.2d 536 (Mich. Ct. App. 2001).

In this case, the Facility had a sexual harassment policy in place. The policy provided employees with two sexual harassment coordinators to which they were directed to report any complaints of harassment. However, the policy further provided that, if an employee does not feel comfortable reporting a complaint to the coordinators, the employee should report the incident to someone within supervision. Vredevelt has conceded that she did not report many of the alleged instances of sexual harassment. Thus, GEO did not have the opportunity to investigate and take remedial action due to complaints from Vredevelt. Specifically, during her deposition Vredevelt admitted that she did not report the following incidents: (1) Deputy Warden Bosse's comment that she should be home "barefoot and pregnant"; (2) Officer Griffin's comment to her about her "camel toe" when she wore her fatigues; (3) the CERT members' bets about what color underwear she wore and their requests to see her tattoos; and (4) a fellow corrections officer's comments of "let's go for a quick f - - k" and "give me a b - - w job."

Notwithstanding this lack of actual notice, Vredevelt contends that GEO had constructive knowledge of the hostile environment at the Facility due to other women's complaints. In addition, she argues that there was a general pervasiveness of sexual harassment toward females at the Facility. Specifically, Vredevelt asserts that women were commonly called "pod bitches" and "control bitches" and that they were never assigned to the good post positions. Thus,

Vredevelt asserts that GEO was constructively aware of the sexual harassment due to an overall negative attitude toward, and poor treatment of, females throughout the Facility. Again, however, the record does not support Vredevelt's contention.

Vredevelt admitted that she remained silent about most of the alleged incidents and complained about only two incidents over a three year period. Further, she testified during her deposition that much of the alleged conduct was "not so apparent." Moreover, in her resignation letter to the company, Vredevelt expressed how much she enjoyed working at the Facility, noting that "[t]here [was] no reason [she] would not come back to work for WCC in the future." Again, Vredevelt failed to put GEO on notice of the alleged sexual harassment. Although she claims that the sexual harassment complaints of other female employees were sufficient to put GEO on constructive notice of the hostile environment at the Facility, we cannot conclude based on the totality of the circumstances that this evidence establishes that the alleged sexual harassment was such that GEO had constructive notice. *See e.g.*, *Sheridan*, 637 N.W.2d at 545-46; *Elezovic*, 637 N.W.2d at 783 (complaint of alleged sexual harassment of plaintiff's co-worker cannot be said to establish notice with respect to plaintiff's claim of harassment).

Because Vredevelt failed to show that she provided actual or constructive notice to GEO concerning the existence of a sexually hostile working environment, it cannot be liable for her hostile environment claim. *Chambers*, 614 N.W.2d at 916; *Radtke*, 501 N.W.2d at 168. Thus, the district court did not err in granting summary judgment to GEO regarding this claim.

III.    **Intentional Infliction of Emotional Distress Claim**

The district court was also correct in concluding that Vredevelt failed to present a genuine issue of material fact in support of her claim for intentional infliction of emotional distress. Intentional infliction of emotional distress is proved by the following elements: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908 (Mich. 1985). The district court determined that Vredevelt failed to present evidence demonstrating extreme and outrageous conduct. To be extreme and outrageous, Michigan courts have stated that the conduct must be so extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community. *Id.* at 908-09. We agree that Vredevelt's allegations do not state a claim for intentional infliction of emotional distress. Because Vredevelt cannot establish a prima facie case, the district court properly granted summary judgment.

## CONCLUSION

We **AFFIRM** the judgment of the district court.

**CLAY, J., concurring in part and dissenting in part.** I join Parts I-A, C and E, as well as Parts II and III of the majority's opinion. I write separately because the majority ignores or discounts Vredevelt's direct evidence of discrimination in connection with her removal from the CERT team and failure to be promoted to sergeant. I therefore respectfully dissent from Parts I-B and D of the majority opinion.

## I.

### A.       Removal From the CERT Team

The majority concludes that Vredevelt was removed from the CERT team because of modifications in her work schedule. While this is ostensibly a legitimate nondiscriminatory reason, the majority inappropriately discounts the fact that when Vredevelt questioned Deputy Warden Bosse about her dismissal, Bosse responded that "if she didn't like his authority, then she should be home barefoot and pregnant." (Joint Appendix, "J.A.," at 808.) This type of sexist comment constitutes direct evidence of gender discrimination because it suggests that Vredevelt's sex played a role in Warden Bosse's decision to remove her from the CERT team. *See Harrison v. Olde Fin. Corp.*, 572 N.W.2d 679, 683 (Mich. Ct. App. 1997) ("For example, racial slurs by a decisionmaker constitute direct evidence of racial discrimination that is sufficient to get the plaintiff's case to the jury.") (quotation and citation omitted); *see also Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999) ("[D]irect evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.").

In a case such as this, involving direct evidence of discrimination and mixed motives, "*i.e.*, where the adverse employment decision could have been based on both legitimate and legally impermissible reasons, a plaintiff must prove that the defendant's discriminatory animus was more likely than not a 'substantial' or 'motivating' factor in the decision." *Sniecinski v. Blue Cross and Blue Shield of Mich.*, 666 N.W.2d 186, 192-93 (Mich. 2003) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244 (1989) (Plurality Opinion)). Thus, the proper inquiry at summary judgment is whether, viewing the evidence in the light most favorable to Vredevelt as the non-moving party, a reasonable trier of fact could find that Vredevelt's sex was a substantial or motivating factor in Warden Bosse's decision to remove her from the CERT team. Instead of according proper weight to the 'barefoot and pregnant' comment, the majority dismisses it out of hand, giving conclusive weight to Defendant's proffered reason for removing Vredevelt from the CERT team. The majority's analysis is inappropriate because at the summary judgment stage, it is not this Court's role to weigh the evidence. *Sterling China Co. v. Glass, Molders, Pottery, Plastics & Allied Workers Local No. 24*, 357 F.3d 546, 551 (6th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)) ("The judge is not to weigh the evidence and determine the truth of the matter, but rather determine whether there is a genuine issue for trial."). In my opinion, the direct evidence proffered by Vredevelt creates a genuine issue of material fact on the question of whether discriminatory animus was a substantial or motivating factor in Warden Bosse's decision to remove her from the CERT team,

such that a reasonable jury could find in her favor. Therefore, I would reverse the district court's grant of summary judgment to Defendant on the CERT team removal issue.[4]

## B. Failure to Receive Promotion

I would also reverse the district court's grant of summary judgment to Defendant on the promotion issue. I do not think that the evidence supports Vredevelt's claim that she was more qualified than DeWolf for the sergeant's position, and I agree with the majority's position that "[a]t best, the comparison in this case is between two qualified employees." (Majority Op. at 15.) Once again, however, the majority discounts Vredevelt's direct evidence of discriminatory animus by individuals who were involved in deciding whether to promote her, thereby inappropriately weighing the evidence and usurping the role of the trier of fact. *Id.*; *see also Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 657-58 (6th Cir. 2000) ("No doubt, [defendant] may have sharp retorts to many of [plaintiff's] factual claims . . . [which] could well convince a trier of fact of its case. But at this stage in the trial, the district court's and our role is not to weigh the evidence and determine the truth of the matter, but to determine whether there

[4]Although it is unnecessary for the majority to address the issue given its conclusion that summary judgment was properly granted, I would also find that removal from the CERT team constituted a materially adverse employment action. Materially adverse employment actions include "'termination of employment, a demotion evidence by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.'" *Wilcoxon v. Minn. Mining & Mfg. Co.*, 597 N.W.2d 250, 257 (Mich. Ct. App. 1999) (quoting *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (citations omitted)). It is undisputed that CERT team members received a small amount of additional monetary compensation. Perhaps more importantly, however, Defendant's own arguments support the notion that CERT team membership was prestigious and an important element in receiving a promotion. One of the reasons offered by Defendant in support of the decision to promote DeWolf over Vredevelt was DeWolf's position as CERT team leader. If this is true, then Vredevelt's removal from the CERT team, and by extension, the elimination of her ability to become a CERT team leader, would materially reduce her chances of receiving a promotion in the future. In this sense, an employee who is not a CERT team member has 'a less distinguished title' or position for promotion purposes than a CERT team member. Therefore, Vredevelt's dismissal from the CERT team arguably constituted an adverse employment action.

is a genuine issue for trial. To do so, the court must look at the evidence and make all reasonable inferences in the light most favorable to [plaintiff].") (internal citations and quotation marks omitted). Officer Stuart Morin testified that he was present when a captain who had been on the review board for Vredevelt's promotion stated that "women don't belong in the prison and shouldn't be in that position, they are not capable of doing it." (J.A. at 852.) Vredevelt also swore in an affidavit and testified at her deposition that Lieutenant Kevin McDaniels informed her that Deputy Warden Bosse specifically told him Vredevelt was not promoted because Bosse "would not promote any females while he was deputy warden." *Id.* at 450, 807. Additionally, Jill Sable, the Personnel Director who participated in Vredevelt's promotion review, testified that Deputy Warden Bosse was tougher in his questioning of Vredevelt than of DeWolf and Kevin Cox, another male candidate for the promotion, and further, that the questions Bosse asked Vredevelt were "in a different tone and in a different way" and "were more detailed." *Id.* at 846. Finally, there is the 'barefoot and pregnant' comment made by Deputy Warden Bosse in connection with Vredevelt's removal from the CERT team, which suggests that discriminatory animus colors Bosse's employment decisions.

The majority concludes that Warden Elo made the decision of whom to promote, and therefore, Vredevelt's direct evidence of discriminatory animus by Deputy Warden Bosse and others is irrelevant. However, the record reflects that although Warden Elo was technically the final decisionmaker, the manner in which the promotion decision was made left a great deal of influence to individuals other than Elo. Contrary to the majority's claims, we have previously held that "courts must consider as probative evidence any statements made by those individuals

who are in fact *meaningfully involved in the decision* to terminate [or promote] an employee." *Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) (emphasis added); *see also Hussain v. Highgate Hotels, Inc.*, 126 Fed. Appx. 256, 262 (6th Cir. 2005) (unpublished decision) (stating that in employment discrimination context, direct evidence "shows that the person who made the challenged decision, *or was otherwise meaningfully involved in that decision*, had a bias or that bias affected the challenged decision") (emphasis added). Warden Elo selected a three-member promotion board, which was chaired by Deputy Warden Bosse as the Deputy Warden of Security. Each of these board members interviewed and evaluated the candidates for promotion, and provided a scored review. The scores were then tabulated by Sable, as Personnel Director, and given to Warden Elo, who reviewed the scores and discussed them with Deputy Warden Bosse. There is no evidence that Warden Elo interviewed the candidates or otherwise independently interacted with them; to the contrary, the evidence demonstrates that the materials that formed the basis for Warden Elo's decision were provided and compiled by other individuals, most notably Deputy Warden Bosse. Therefore, the three-member board, and Deputy Warden Bosse, while not the ultimate decisionmakers, had a significant amount of influence in deciding which candidate would be promoted, and their discriminatory comments are clearly relevant evidence in assessing Vredevelt's claim. *Cf. DiCarlo v. Potter*, 358 F.3d 408, 416-17 (6th Cir. 2004) (holding that derogatory comments by supervisor constituted direct evidence of discriminatory animus, because although manager made ultimate decision to terminate the plaintiff, supervisor made recommendation to manager and was therefore meaningfully involved in the decision to fire the plaintiff).

Additionally, because Vredevelt has produced direct evidence of discriminatory animus by individuals involved in the promotion decision, the majority errs in suggesting that the *McDonnell Douglas* burden-shifting framework is appropriate. *See Harrison*, 572 N.W.2d at 683; *DiCarlo*, 358 F.3d at 415. Defendant claims that DeWolf was promoted due to his military background and higher test scores, which could be legitimate reasons for the decision to promote him over Vredevelt.[5] *See Sniecinski*, 666 N.W.2d at 193 (citing *Price Waterhouse*, 490 U.S. at 244-45) (stating that a mixed motive case is one in which "the adverse employment decision could have been based on both legitimate and legally impermissible reasons," and "a defendant may avoid liability by proving that it would have made the same decision even if the impermissible consideration had not played a role in the decision."). Thus, the relevant question for this Court is whether, viewing the evidence in the light most favorable to Vredevelt, there is a genuine issue of material fact on the issue of whether her sex was a substantial or motivating factor in the decision not to promote her. *See id*. at 192-93. Despite Defendant's proffered reasons for promoting DeWolf, given the direct evidence of discriminatory animus by Deputy Warden Bosse and another member of the promotion review board, a reasonable trier of fact could find that discrimination was a substantial or motivating factor in the decision not to promote Vredevelt. Therefore, I would reverse the district court's grant of summary judgment to Defendant on the promotion issue.

**II.**

---

[5]I question whether the test score issue is significant given that only 1.5 percentage points separated Vredevelt and DeWolf's scores, and both scored highly on the test, *i.e.*, 97% for Vredevelt versus 98.5% for DeWolf.

I join the majority in upholding the grant of summary judgment to Defendant on Vredevelt's hostile work environment and intentional infliction of emotional distress claims, as well as her disparate treatment claims involving post assignments, changing facilities, and constructive discharge. However, because Vredevelt has presented direct evidence of discriminatory animus in connection with her removal from the CERT team and her failure to be promoted to sergeant, summary judgment is inappropriate on these issues. I therefore respectfully dissent from Parts I-B and D of the majority opinion.